James E. RIVERS

v.

UNION CARBIDE CORPORATION, Appellant.

No. 17423.

United States Court of Appeals, Third Circuit.

Argued Jan. 19, 1970.

Decided April 30, 1970.

---

Timothy J. Mahoney, Krusen, Evans & Byrne, Philadelphia, Pa. (E. Alfred Smith, Philadelphia, Pa., on the brief), for appellant.

Charles F. Love, Freedman, Borowsky & Lorry, Philadelphia, Pa., for appellee.

Before FORMAN, SEITZ, and ADAMS, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Eastern District of Pennsylvania entered pursuant to a jury verdict in favor of James E. Rivers, appellee, and against Union Carbide Corporation,[1] appellant, in the amount of $6,000. The action was instituted in admiralty under the Jones Act, 46 U.S.C.A. § 688, for damages resulting from a fall by Mr. Rivers, allegedly caused by the negligence of Union Carbide, and the unseaworthiness of its vessel, the SS R. E. Wilson. The jury returned a verdict in the form of answers to interrogatories, finding that Union Carbide's vessel was not unseaworthy, Union Carbide was negligent and Mr. Rivers was contributorily negligent. There were no post-trial motions. The only issues raised by this appeal revolve around hospital

---

1. As the suit was originally instituted Joshua Hendy Corporation was a codefendant but on the request of James E. Rivers, plaintiff, it was "separated out of the case." Appendix 16a.

records offered in evidence by Union Carbide and rejected by the District Judge.

At trial the following facts were elicited on direct and cross-examination from Mr. Rivers who was the only witness in his behalf to testify to the facts leading up to the accident: that he reported for work late in the afternoon of June 30, 1964, and was ordered by Mr. Finley R. Parker, the Ship's Steward, whom he met at the gangway, to return for duty the next morning, July 1st; that he left the shipyard in the company of Mr. Parker and other members of the crew stopping off for a couple of drinks; that he then invited Mr. Parker to his home for some food at which time no drinks were served; that they then proceeded to Mr. Parker's lodgings where he stated he had only one drink and that next morning, July 1, Mr. Rivers had his daughter drive him, Mr. Parker and the other crewmen to the shipyard where they boarded the vessel at 8 a. m. Mr. Rivers asserted that he first understood the ship would sail July 2 but learned soon after he was on board that it would sail in the afternoon of July 1st. He realized that he was without his gear which he asked Mr. Parker for permission to fetch from his house. When his request was denied he applied to the Master of the vessel who granted it. Upon his return to the ship he found that he had been discharged. He talked about this with Mr. Parker in the galley who remained adamant in his decision that his employment had been terminated. Mr. Rivers then decided to go ashore and discuss the problem with his union representative. He testified that

> "just as I stepped out of the galley, over into the pantry, there came this water, and simultaneously, which means that my feet and the water came into contact, and I went up and struck this shoulder and my head, one side and I became dazed."

As he was falling he noticed a pantryman with "apparently a pitcher or a bucket."

As a result of the accident Mr. Rivers suffered a dislocation of the right shoulder and a fracture of its greater tuberosity. He remained in the hospital from July 1 to July 13 when he was discharged. He was declared to be fit for duty on October 27, 1964. Mr. Rivers denied that he was acutely intoxicated at the time he was admitted to the hospital and asserted that he did not give the hospital officials any information then for he was too dazed. He recalled, however, that on the following morning (July 2) he told the doctor how the accident occurred and that he had been drinking on the evening prior to the day of the accident.

Mr. Parker was the only witness called by Union Carbide to testify to the facts leading up to the accident. His recollection of the events differed sharply from that of Mr. Rivers. Concerning the incidents on the evening of June 30th, he testified that after leaving the shipyard Mr. Rivers and he stopped at a place and had four or five "pretty heavy drinks"; that during the visit at Mr. Rivers's home he, Mr. Rivers, consumed more than one drink; that later at his, Mr. Parker's, lodging Mr. Rivers had a few more drinks and that the conversation of the evening of June 30th disclosed that Mr. Rivers was aware that the ship was to sail on July 1st. Mr. Parker further testified that he denied Mr. Rivers's request to go ashore in the morning of July 1st because his services were urgently required in the mess hall but he told Mr. Rivers he would be permitted to leave the vessel in the afternoon; that upon learning that Mr. Rivers had gone ashore without his permission he discharged him and requested the union to furnish a replacement; that upon the return of Mr. Rivers, he, Mr. Parker, encountered him in the mess hall where Mr. Rivers seemed to be "half asleep"; that he smelled alcohol on Mr. Rivers's breath and noticed that he was having difficulty speaking; that he escorted Mr. Rivers to the Captain's quarters where he explained the circumstances and left; that approxi-

mately 45 minutes later he learned of Mr. Rivers's fall and went to the mess hall; that he saw no water on the deck and that the routine scrubbing had been done the day before.

In a statement Mr. Parker gave to the Union Carbide's representative 24 days after the accident he did not mention that Mr. Rivers was intoxicated. His explanation was that he did not feel that it was necessary because Mr. Rivers was his friend and that the statement would be on Mr. Rivers's permanent record. He conceded that immediately after the accident Mr. Rivers traversed a catwalk approximately 250 feet long without assistance.

## I

Union Carbide attempted to substantiate its witness's testimony by offering into evidence records of the United States Public Health Service Hospital at Savannah, Georgia, relating to the admission of Mr. Rivers and his subsequent treatment. A page numbered 77 of the hospital record entitled "Clinical Record, History—Part I," under the caption "Nature and Duration of Complaints (include circumstances of admission)," it was stated: "55 yr. old NM [negro male] acutely intoxicated." On the same page under "History of Present Illnesses" it was stated "Started drinking tues. evening. Wed. morning arm was not broken next thing pt. [patient] remembers was waking up 7/2 [the 2 was written over a 3 or vice versa]." The page, numbered 76, entitled "Clinical Record, Narrative Summary," prepared from the day by day Clinical Record, stated under the rubric "History" that the "Patient was admitted acutely intoxicated." Mr. Rivers's counsel objected to the admission of the records as being highly prejudicial and conclusory since the statements were unsupported by facts and the "Narrative Summary" was dated three months after the accident.[2] The District Judge held that the records were inadmissible, except that he did admit in evidence Mr. Rivers's proffered one page abstract of the hospital records entitled "Statement of Patient's Treatment" which contained no mention of intoxication.[3]

On appeal it is the contention of Union Carbide that the hospital records in their entirety should have been admitted into evidence. It argues that they were properly admissible under the Business Records Act.[4]

The Act states:

(a) In any court of the United States and in any court established by an Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or

2. Mr. Rivers argues that the "Narrative Summary" is inadmissible because it was not recorded in a reasonable time. While it is true that it was signed some three months after Mr. Rivers's admission to the hospital, it must be recognized that the "Narrative Summary" is only a recapitulation of the entries contained in the "Clinical Record."

3. Aside from the routine identification material and dates the Statement contains the following information:

"6. CHIEF COMPLAINT AND DATE OF ONSET (If injury, give date, nature and place of accident)

Entered with injury to right shoulder which occurred 11 AM Wednesday morning aboard SS R. E. Wilson.

"7. DIAGNOSES

Dislocation of the right shoulder and fracture through greater tuberosity.

"8. OPERATIONS OR OTHER PROCEDURES

Reduction of right shoulder.

"9. REMARKS

Unable to work indefinitely. To return to clinic 7–21–64."

\*    \*    \*    \*    \*

4. 28 U.S.C. § 1732.

event within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility."

Under the statute, admissibility is predicated upon satisfying two requirements. The record must have been made in the regular course of business, and it must have been the regular course of the business to make such record contemporaneously or within a reasonable time. If these two requirements are satisfied, the document is admissible.[5] All other circumstances surrounding the making of the entry may be shown to affect the weight the record should be accorded.[6] Generally, when the above two requirements are met it has been said:

"[t]here is good reason to treat a hospital record entry as trustworthy. Human life will often depend on the accuracy of the entry, and it is reasonable to presume that a hospital is staffed with personnel who competently perform their day-to-day tasks. To this extent at least, hospital records are deserving of a presumption of accuracy even more than any other types of business entries."[7]

In the instant case, there is no suggestion that the statement contained in the "Clinical Record History" was not made in the regular course of business. It was made as part of the admission procedure. Also, there is no doubt that it is the regular practice of the hospital to keep these records. Thus, under the strict interpretation of the Business Records Act, the requirements of admissibility were satisfied.

There is, however, some controversy as to whether all entries of observations of a diagnostic nature are admissible.[8] In several instances, hospital records which contained conclusory observations were held to be inadmissible evidence.[9] Primarily, they were excluded because the diagnoses contained in the records were not based on directly observable facts and were not observations that everyone skilled in the profession would be likely to reach.[10] Along this line it is argued that cross-examination is a necessary aid in exposing error, and that the Business Records Act was not intended to provide a means of allowing every entry into evidence without the benefit of testing the recorder's qualifications.[11] It should be noted that these cases have not held that all diagnoses are inadmissible and even some have recognized that routine observations are permissible evidence under the statute.[12]

---

5. See Johnson v. Mississippi Valley Barge Line Company, 335 F.2d 904 (3 Cir. 1964) ; Masterson v. Pennsylvania R. R. Company, 182 F.2d 793 (3 Cir. 1950) ; Bartkoski v. Pittsburgh & Lake Erie R. R. Co., 172 F.2d 1007 (3 Cir. 1949) ; Norwood v. Great American Indemnity Co., 146 F.2d 797 (3 Cir. 1944).

6. See Gass v. United States, 416 F.2d 767 (D.C.Cir. 1969) ; Cf. Gaussen v. United Fruit Company, 412 F.2d 72 (2 Cir. 1969).

7. Thomas v. Hogan, 308 F.2d 355, 361 (4 Cir. 1962). See also Medina v. Erickson, 226 F.2d 475, 482 (9 Cir. 1953).

8. See generally the cases collected in Thomas v. Hogan, *supra*, notes 4–15, pp. 359–360 and Hussein v. Isthmian Lines, Inc., 405 F.2d 946, 948–949 (5 Cir. 1968).

9. See note 8, *supra*.

10. See Skogen v. Dow Chemical Company, 375 F.2d 692, 705 (8 Cir. 1967) ; New York Life Ins. Co. v. Taylor, 79 U.S.App. D.C. 66, 147 F.2d 297 (1944).

11. See note 10, *supra*. See also dissenting opinion in Kissinger v. Frankhouser, 308 F.2d 348, 352 (4 Cir. 1962).

12. New York Life Ins. Co. v. Taylor, *supra*, note 10. Also, many of these courts have agreed that administrative entries such as treatment and costs are admissible. See, *e. g.*, Missouri Pacific R. R. Co. v. Soileau, 265 F.2d 90, 94 (5 Cir. 1959) ; Ranger, Inc. v. Equitable Life Assurance Society of United States, 196 F.2d 968, 973 (6 Cir. 1952).

The most recent opinion exhaustively dealing with this question is found in Thomas v. Hogan.[13] There, the question of whether a diagnosis of intoxication and the result of a scientific test to determine intoxication contained in a hospital record are admissible was fully explored. The court held that:

"We read the statute as supplying a presumption that diagnoses and scientific tests are properly made by qualified personnel, if the recorded information reflects usual routine of the hospital and if it is the practice to record such data contemporaneously or within a reasonable time. For example, a recorded diagnosis that a patient had pneumonia would be admissible, but a diagnosis of a rare disease might not, since it would not be one routinely made by the hospital personnel. Likewise, a record entry of a commonly performed blood test would be admissible, while an entry of the result of a scientific test infrequently done might not. When the two statutory requirements have been met, it makes no difference whether the record reflects an expression of medical opinion or an observation of objective fact. * * *"[14]

In the present case the factors which have led other courts to exclude hospital records are not present. The observation is certainly the type of observation that the trained eye of a doctor could make with reasonable accuracy. It is identical to other instances where it has been thought that hospital records are considered inherently trustworthy because of the competence attributed to hospital personnel who deal in life and death.[15] Moreover, it is signed by a physician.[16]

Mr. Rivers contends that the conclusory nature of the disputed entry in this case renders it inadmissible. Such a proposition is untenable.[17] The argument only may be used to affect the weight that should be accorded to the record.[18]

■ The outcome of this case depended in a large measure on whether the jury found that Mr. Rivers was intoxicated at the time of the accident. It was entitled to consider the hospital record which would shed light on the question.[19] Indeed, the admission of

13. 308 F.2d 355 (4 Cir. 1962).

14. *Id.* at p. 360.

15. *See* note 7, supra, and accompanying text. See also Washington Coca Cola Bottling Works, Inc. v. Tawney, 98 U.S. App.D.C. 151, 233 F.2d 353 (1956).

16. The controverted observation "acutely intoxicated" appears on page marked 77 "History—Part 1." No physician's signature appears until the end of the page marked 79 "History—Part 3" under the words "signature of physician" and beside the date "7–1–64." That signature is difficult to decipher. However, when comparisons are made with
(a) the name under "signature of physician" at the end of the physical examination on page marked 81;
(b) the name of the physician who requested the four laboratory reports as shown on the pages marked 83 and 84; and
(c) the signature of the physician under the title "Doctor's Progress Notes" on one of the two unnumbered pages following the page marked 84 and on "Doctor's Orders" on the page marked 87,
it becomes obvious that the somewhat illegible signature is that of Dr. Gluck.

17. Two courts have held that once a hospital record has met the two requirements for admissibility, the entire record must be admitted. Harris v. Smith, 372 F.2d 806, 816 (8 Cir. 1967) and Glawe v. Rulon, 284 F.2d 495, 498 (8 Cir. 1960).

18. 28 U.S.C. § 1732.

19. See Reed v. Order of United Commercial Travelers, 123 F.2d 252 (2 Cir. 1941), where the court held that a hospital record containing the statement "apparently well under the influence of alcohol" was admissible. The court stated that:
"[t]he jury might have given more credence to the recorded diagnosis of the attending doctor than they were willing to give to the testimony of witnesses who testified to [the plaintiff's] drinking during the evening preceding the accident." At 253.

only the single sheet dated July 13, 1964, the end of the hospitalization, entitled "Statement of Treatment,"[20] a mere one line abstract of each of several items which were entered in detail in the regular course of activity in the hospital record only enlarges the prejudice to Union Carbide when the original hospital record was excluded. Thus, the conclusion appears inevitable that the District Judge erred in admitting the one page abstract to the exclusion of the entire hospital record as offered.

## II

Union Carbide also assigns as error the District Judge's decision to exclude from evidence its offer of hospital records of Mr. Rivers in the years 1958, 1959, 1961, 1962, 1963 and 1965. The records note that Mr. Rivers was a chronic alcoholic before and after the accident.

A. Union Carbide first attempted to lay a foundation for an offer of the records when it asked Mr. Rivers on cross-examination what his drinking habits were in the years 1963 and 1964. Union Carbide claims that had he said that he was not in the habit of drinking, the records would have contradicted him thereby raising a question concerning his credibility. However, the District Judge sustained Mr. Rivers's objection to this and a line of such cross-questioning.

■ In this case, the question of Mr. Rivers's sobriety at the time of the alleged accident was crucial. The extent of his addiction to alcohol was relevant to the issue of whether he was intoxicated on the day of the accident.[21] Union Carbide's proffered question would have shed some light on this.[22] Moreover, the cross-examination was not necessarily limited to the precise scope of the direct examination of Mr. Rivers in which of course there was no allusion to "drinking habits." Here, Mr. Rivers was a party and not merely a witness, and susceptible to a broader cross-examination.[23]

■■ If Mr. Rivers's answers were in the affirmative that his drinking habits were such as to indicate alcoholism, need to impeach him would be dissolved and the records looking to that purpose would be inadmissible. If Mr. Rivers's answers were in the negative to this line of questioning the records could be introduced to establish contradictory facts.[24] Thus, the District Judge erred in excluding the question and the line.

B. Later, following an examination by Mr. Rivers of his witness, Louis Parise, a port agent of the Maritime Union, as to the economic value of his earning ability, Union Carbide offered the records on the theory that they would disclose a limitation on the ability of Mr. Rivers to perform sustained employment and tend to mitigate the damages. The District Judge also sustained an objection to this offer. In effect, Union Carbide urges that the hospital records are admissible for the purpose of furnishing the jury with a basis from which to infer that Mr. Rivers was so disabled by his chronic alcoholic condition that he would not have been able to work continuously for as long as four months, the length of time for which damages were claimed in this case. For authority supporting the contention, it offers Marquez v. American Export Lines.[25] But that case in a

---

20. See note 3, *supra*.

21. *Cf.* McCormick on Evidence § 162 page 342 n. 11 (1954) ; I Wigmore on Evidence, § 96, p. 529 (3 Ed. 1940).

22. *Cf.* Sleek v. J. C. Penney Co., 324 F.2d 467 (3 Cir. 1963) ; Cranston v. Baltimore and Ohio R. R. Co., 258 F.2d 630, 632 (3 Cir. 1958).

23. Kroger Grocery & Baking Co. v. Stewart, 164 F.2d 841, 844 (8 Cir. 1947).

24. III Wigmore, *supra*, § 1020 p. 692.

25. 384 F.2d 920 (2 Cir. 1967).

640

per curiam opinion speaks only to the subject in one cryptic comment:

> "As to the 'drunkenness' point, the testimony was relevant on the issue of the plaintiff's credibility and with relation to the amount of damages sustained, namely, time plaintiff worked." [26]

The case is distinguishable from the instant one because here no damages for permanent injury are sought.

A second case, Mahon v. Reading Company,[27] cited by Union Carbide to support this contention is equally inapposite. That case dealt with the effect of a prior accident on loss of work time. It was held that cross-examination as to the prior accident was improperly excluded because the jury could have inferred that the lost work was caused by an earlier accident. Thus the damage issue revolved around the question of whether plaintiff's lost work time was caused by the first or second accident, a situation different from the instant case.

Here the issue sought to be raised by Union Carbide is whether Mr. Rivers would have been able to work as long as four months by reason of his alleged alcoholic condition. Absent further foundation for the offer, it would have required the jury to arrive at a sheerly speculative conclusion, particularly since Mr. Rivers's claim was not for any permanent injury but limited to damages arising only within a four month span. Under these circumstances the District Judge's exclusion of the offer was proper.

The judgment of the United States District Court for the Eastern District of Pennsylvania will be reversed and the case remanded for a new trial in conformity herewith.

---

26. *Id.* at 921.

27. 367 F.2d 25 (3 Cir. 1966).