Clifton F. HOFFMAN

v.

STERLING DRUG, INC. and Winthrop
Laboratories, Inc.[1]
Civ. No. 68–391.

United States District Court,
M. D. Pennsylvania.

April 19, 1974.

1. The defendant, Winthrop Laboratories, Inc., is a division of and a wholly owned subsidiary of Sterling Drug, Inc.

852

Joseph D. Shein, Shein & Brookman, P. A., Philadelphia, Pa., William B. Anstine, Jr., Anstine & Anstine, York, Pa., for plaintiff.

Bernard J. Smolens, Joseph A. Tate, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION AND ORDER

HERMAN, District Judge.

This case arises out of a products liability claim brought by the plaintiff seeking compensation for the blindness the defendants' drug Aralen allegedly caused him. A very lengthy trial was conducted which resulted in a jury verdict for the plaintiff in the sum of $437,000. This court denied the defendants' motion for a new trial and the plaintiff's motion for a re-trial on the issue of punitive damages. On cross appeals the circuit reversed and remanded for a new trial on the issues of compensatory and punitive damages. Hoffman v. Sterling Drug, Inc., 485 F.2d 132 (3d Cir. 1973).

On remand oral argument was had and briefs submitted on numerous crucial and controlling issues which require resolution before the parties undergo a second prolonged trial. The court also heard argument on the question of whether the issues at hand should be certified as controlling questions of law pursuant to 28 U.S.C. § 1292(b) and thereby submitted to the Court of Appeals for pre-trial resolution.

## INFLATION AND FUTURE EARNINGS

At the original trial this court allowed the plaintiff's actuary/economist to tes-

tify as to the estimated loss of future earnings for the plaintiff, an architectural draftsman. The percentage used by the economist was based upon the testimony of two area architects who estimated that salaries of individuals engaged in work comparable to that of plaintiff, had, over the previous five years, increased between 6 and 10% per annum. Based on those two annual percentage increases and the plaintiff's 26-year life expectancy, the economist computed two lifetime earning figures and reduced each to present worth. It was this testimony which the Court of Appeals ruled to have been improperly admitted into evidence. The present conflict between the parties finds them completely at odds on the issue of future economic trends. The plaintiff contends that the circuit found error in our admitting the testimony based on such a brief span of time. Plaintiff's counsel has indicated that he is prepared to supply a 20-year history of economic trends to satisfy what he sees as the rule of this circuit. The defendants have countered by asking this court to prohibit all evidence of future inflationary and economic trends.

The resolution of the matter is rendered more complex due to an imprecision of terms. Frequently the expressions "earnings increase factor" and "economic trends" (inflation/deflation) are used interchangeably by the courts. The distinction, as this court views it, is that the former constitutes merit raises predicted over the plaintiff's life expectancy, while the latter reflects economic trends separate from any individual's employment situation.

The testimony at issue, whatever its label, involves regular annual increases based on general economic conditions (primarily inflation) as the circuit noted in Hoffman:

"Although offered in terms of continuing increases in wage rates, as opposed to a continuing decline in the value of the dollar, the testimony in question reflects a continuing inflationary spiral. . . ." 485 F.2d, at 143.

If this court concludes that future economic trends are a permissible part of future earnings we must first determine how such trends are to be proved. One method, in effect, averages the rate of inflation/deflation over a substantial period from the past, then extrapolates that annual average over the plaintiff's life expectancy. The other requires a projection into the future economic trends not necessarily controlled by past indicators.

In Hoffman the circuit said: "We note that inflationary considerations have been almost universally rejected as a factor in computing future losses." 485 F.2d, at 143–144.

It bears note that the circuit cited Sleeman v. Chesapeake and Ohio Ry. Co., 414 F.2d 305 (6th Cir. 1969) for the proposition that future inflation is speculative per se. It was the Sleeman court which aptly described the quagmire:

"[T]he inflation versus deflation debate rages inconclusively at the highest policy levels of our government, in national electoral campaigns, in learned economic journals and is exemplified in the daily gyrations of the stock markets. The debate seems unlikely to be resolved satisfactorily in one personal injury trial. And if testimonial resolution of this factor bearing on the future is attempted, the door is opened to similarly speculative and debatable offsets tending in other directions." [2]

---

2. An example of the "offshoots" which have been avoided is income taxation of lost future earnings. Strictly speaking, a plaintiff secures a form of windfall in a judgment which grants him full compensation for lost earnings yet does not tax those earnings. The task of computing such taxes would be too great. In Domeracki v. Humble Oil & Refining Co., 443 F.2d 1245, 1251 (3d Cir. 1971) this circuit granted either side the right to an instruction that juries should not adjust their verdicts to allow for income taxes. This is an example of an "offshoot" that gives more weight to pragmatism than an endless process of making the plaintiff whole.

Immediately thereafter the Hoffman court found Magill v. Westinghouse Electric Corp., 464 F.2d 294 (3d Cir. 1972) to be controlling:

> "Similarly in the case at bar, we do not think there was a substantial factual basis for the assumption that salaries of architectural draftsmen in the York area would increase at 6% per year for the next 26 years. Both the present case and *Magill* are marked by the total absence of any evidence of probable future salary or economic trends. . . . In short, the projected 6% per year earnings increase in the present case is speculation, requiring a new trial on the question of damages." 485 F.2d, at 144.

Plaintiff's counsel attempts to use cases and arguments supportive of projected future incomes in support of his contention that future economic trends affecting that income are similarly admissible.

In this court's view the plaintiff misreads the Hoffman decision's reliance on Magill. The circuit found Magill to govern as a result of this court's refusal to allow the plaintiff's economist to project his opinion on the declining value of the dollar, thus leaving the sole issue of an earnings increase factor for consideration by the jury.

> "[N]o evidence was introduced in the case at bar as to the probability or magnitude of future inflationary trends and there was no evidence projecting inflation over a long period of time. . . .
>
> \* \* \* \* \* \*
>
> "The propriety of Schoenwald's [the plaintiff's actuary/economist] use of the 6% 'earnings increase factor' is thereby governed by our recent decision in Magill." 485 F.2d, at 144.

This court's error in the original trial was not our refusal to allow evidence on future economic trends, but rather our admission into the record of an earnings increase factor based on insufficient evidence. A close reading of Magill bears this out. Judge Adams' opinion in Magill carefully distinguishes between future earning power and future inflation. Quoting from Pilipovich v. Pittsburgh Coal Co., 314 Pa. 585, 172 A. 136 (1934), the court made clear that future earning power is determined by looking to the plaintiff's peculiar individual abilities:

> "'[I]t is the duty of the plaintiff to show the earning power of the deceased, or give such evidence in regard to his business, business habits, and past earnings, as may afford some basis from which earning capacity may be fairly estimated (Citation omitted) . . . [T]he pecuniary loss is what the deceased would probably have earned by his labor, physical or intellectual, in his business or profession . . . In fixing this amount, consideration should be given to the age of the deceased, his health, his ability and disposition to labor, his habits of living, and his expenditures.'" 464 F.2d, at 300.

Drawing on the Pilipovich ruling, the Magill court thereafter concluded that "had the administrator introduced well-founded evidence that Mr. Magill would have received certain promotions or pay raises in the future, such evidence might not have been objectionable. However, the Pennsylvania Supreme Court 'has held repeatedly that a claim for damages must be supported by a reasonable basis for calculation; mere guess or speculation is not enough.'" (*Id.*)

At the original trial of the instant case the plaintiff introduced testimony regarding architects' salaries generally rising between 6 and 10% annually. Such testimony is no more than a backhanded mode of injecting inflation into future earnings and is directly contra to the Pilipovich holding that future earnings must be tailored to the particular plaintiff. As if to dispel any doubt the Magill court allowed that:

> "Because there may be a substantial factual basis for use of an earnings increase factor, we do not foreclose the administrator from attempting, at

the new trial, to establish that foundation. . . . We note, however, that *the concepts of inflation and the declining value of the dollar have been almost universally rejected as providing support for the earnings increase factor.*" 464 F.2d, at 301. (Emphasis supplied)

The Hoffman court also relied upon Frankel v. United States, 321 F.Supp. 1331 (E.D.Pa.1970), *aff'd,* 466 F.2d 1226 (3d Cir. 1972). The trial court in Frankel refused to admit evidence that the cost of institutional care was increasing due to inflation. Chief Judge Sheridan of the Middle District (sitting by designation), declared:

> "Economists differ on their predictions. Moreover, plaintiff will have money that can be invested and if inflation continues, the return on the money will be greater, and this would have an offsetting effect." 321 F. Supp., at 1346.

Taken together, this court does not read Magill and Frankel as being equivocal on the issue of economic trends in computing loss of future earnings. The Hoffman decision prefaced its discussion of this issue by citing Russell v. City of Wildwood, 428 F.2d 1176 (3d Cir. 1970) for the proposition that "reasonable certainty" is needed in computing future earnings despite the "host of uncertain contingencies." 485 F.2d at 143.

Harper & James, cited with approval in Sleeman, *supra,* 414 F.2d at 308, and Frankel, *supra,* 321 F.Supp. at 1346, accurately sum up the uncertainty of predicting economic trends which Hoffman decried:

> " 'Future trends in the value of money are necessarily unknown and so always render such damages speculative in a way we cannot escape. If the estimates represent a straight-line projection of present living costs, they will be frustrated by fluctuations either way. If prophecy of change is heeded, frustration will follow if no change, or the opposite change, occurs. When courts have consciously grap-

pled with the problem they have either found all prophecy too speculative and so, perforce, have taken the equally speculative course of betting on a continuance of the status quo; or they have made intuitive and not always very wise judgments that present conditions represent a departure from some imaginary norm to which they think we shall rapidly return. . . .' " 414 F.2d, at 308.

" 'Though some courts have sanctioned instructions permitting the jury to take into account inflation between the injury and the trial, there is little or no authority in favor of charging the jury to take future inflation into account, *see* 2 Harper and James, The Law of Torts § 25.11 (1956) . . . .' " 321 F.Supp., at 1346.

■ As difficult as it might be to separate (in the actuarial sense) the earnings increase factor of a particular plaintiff from future economic trends, separate they must be. Therefore, this court concludes that at the upcoming re-trial on the merits, the plaintiff will be allowed to argue the earnings increase factor to the jury only insofar as the evidence applies to the plaintiff Clifton Hoffman. This court will not allow into evidence any testimony regarding future inflation or deflation, regardless of the foundation laid for it.

## PUNITIVE DAMAGES

Next, the court directs its attention to the issue of punitive damages. The circuit court remanded for a new trial the issue of punitive damages, concluding that this court erred in not allowing the plaintiff's eleventh-hour amendment to the complaint. The essence of the plaintiff's prayer for punitive damages is his contention that Sterling Drug, Inc. marketed Aralen (Chloroquine Phosphate) with actual knowledge of, or with wanton disregard as to whether it had seriously harmful side effects, particularly in causing chloroquine retinopathy.

The parties are in agreement that the circuit's decision compels a new trial on the issue of punitive damages. How-

ever, we must resolve a dispute which never reached the circuit. The plaintiff's counsel contends that punitive damages are imposed to punish an outrage to society. Therefore, he argues, the relevant evidence need not be restricted to the plaintiff Hoffman, but includes the impact of Aralen on the whole of society (presumably limited to those who consumed Aralen). As this court understands plaintiff's argument, he would argue to the jury that punitive damages should be assessed against Sterling in an amount reflecting the wrong perpetrated against Hoffman and all like consumers of Aralen.

As support for this position, plaintiff proffers the Restatement of Torts § 908 (2):

> "Where punitive damages are permissible, their allowance and amount are within the discretion of the trier of fact. In assessing such damages, the trier of fact can properly consider the character of the ·defendant's act, the nature and extent of the harm to the plaintiff which the defendant caused or intended to cause, and the wealth of the defendant."

Section 908 has been cited as authority in Pennsylvania,[3] see, Chambers v. Montgomery, 411 Pa. 339, 344, 192 A.2d 355 (1963). However, Pennsylvania has consistently required that the plaintiff secure a verdict for compensatory damages as a prerequisite to punitive damages. Hilbert v. Roth, 395 Pa. 270, 276, 149 A.2d 648 (1959); Certified Laboratories Of Texas, Inc. v. Rubinson, 303 F.Supp. 1014, 1029 (E.D.Pa.1969); Weider v. Hoffman, 238 F.Supp. 437 (M.D. Pa.1965). Moreover, Pennsylvania requires a reasonable relationship between compensatory and punitive damages. Rubinson, supra; Suflas v. Cleveland

Wrecking Co., 218 F.Supp. 289, 290 (E. D.Pa.1963); Givens v. W. J. Gilmore Drug Co., 337 Pa. 278, 285, 10 A.2d 12 (1940). See generally, Comment, 75 Dick.L.Rev. 585 (1971).

The qualifications placed on punitive damages by the Pennsylvania courts are contrary to numerous Comments to § 908 and cast serious doubt on its authority in certain particulars. A products liability case raises punitive damage questions unlike any other realm of tort law, particularly where, as here, strict liability under § 402A of the Restatement of Torts (Second) was introduced as a theory of liability.[4] Clearly, the plaintiff was a member of a class of potential consumers of Aralen and suffered personal injury as a result of the drug. However, this court finds it inconceivable that in a products liability case the defendant could be shown to have a single consumer in mind when producing the particular item.

■ To conclude that this particular victim may collect punitive damages on behalf of that immeasurable group of Aralen consumers is folly. Sterling's intentional wrongdoing, or wanton misconduct, if any, was not done with the plaintiff Hoffman in mind. To the extent that Hoffman was a member of the consuming public he is free to explore the company's testing, marketing and notice procedures as they regard Aralen generally. Such a course will be necessary to show intentional conduct or wanton neglect. In the final analysis, however, the computation of the punitive damage verdict, if any, must be a reasonable sum in relation to the defendant's conduct vis-a-vis the plaintiff.

■ The plaintiff, pursuant to § 908, also wishes to admit into evidence the defendants' net worth. Accounting

3. Counsel for both sides agreed during oral argument that the law of Pennsylvania controls on the issue of punitive damages (N.T. 3). See also, Hoffman v. Sterling Drug, Inc., 485 F.2d 132, 134 n. 1 (3d Cir. 1973).

4. In fact, it is arguable that the original jury found liability solely on strict liability, rais-

ing the possibility that the second jury could reach a contradictory result by imposing a substantial punitive damage verdict. Such a finding would naturally presuppose affirmative misconduct or wanton disregard for safety well beyond the limited confines of § 402A.

problems aside, such a gratuitous gesture by the court would be immaterial in a unique case such as this and would mislead the jury. The net worth concept is relevant in those cases where a tort is committed by and against individuals; a one-on-one situation. As the argument goes, the jury must know a wrongdoer's net worth in order to levy a "fine" sufficient to punish. Comment, 75 Dick.L.Rev. 585 (1971).

In the context of the instant case, the plaintiff's argument creates a genuine opportunity for multiple recovery at the defendants' expense. We note that this is not the only personal injury suit involving Aralen directed against Sterling. Applying the plaintiff's rationale, each injured consumer of Aralen, using identical evidence regarding testing, notice, etc., could individually recover on behalf of "society" to punish the affront. Such a result would be ludicrous. Instead, we view the law to be that each Aralen consumer showing a bona fide injury may, if the evidence warrants, collect his reasonable proportion of the punitive damages the defendant owes to "society." Our conclusion is buttressed by Pennsylvania's requirement that punitive damages "bear a reasonable relationship to compensatory damages." Rubinson, *supra*, 303 F.Supp. at 1029; Suflas, *supra*, 218 F.Supp. at 290. Such a requirement is even more crucial in a case such as this.

Therefore, the court will not allow before the jury evidence of the defendants' net worth, nor will we allow the plaintiff to argue that he should receive punitive damages in a sum computed by the size of Sterling's affront to society. Rather, the plaintiff will be restricted to seeking punitive damages reasonably related to his compensatory damages.

## COMPENSATORY DAMAGES

This court has already concluded that a judgment awarding compensatory damages is a prerequisite to a punitive damage award, and that punitive damages must bear a reasonable relationship to those compensatory damages.

The parties, however, are at odds over the nature and extent of the re-trial on the issue of compensatory damages. The defendants' brief sets out their view of the scope of re-trial:

"Among the issues to be retried are: whether and to what extent the plaintiff suffered a compensatory [sic] injury; whether and to what extent that injury was attributable to defendants' negligence; whether and to what extent plaintiff suffered a loss of earnings or earning power; whether and to what extent that loss was attributable to defendants' negligence. . . ." (Defendants' brief, at 9)

■ This court cannot agree with the defendants' assessment of the situation. Insofar as defendants wish to explore the extent of Clifton Hoffman's visual impairment, they may do so. However, this court will not permit the defendants to dispute that Aralen caused the chloroquine retinopathy. To argue that Aralen is not responsible or only partially responsible runs in the face of the first jury verdict which found the defendants liable. This court's charge expressly directed the jury to find a proximate relationship between Aralen and Hoffman's visual impairment before rendering a verdict in the plaintiff's favor (N.T. 1898). Moreover, we directed the jury to award damages to Hoffman only if a preponderance of the evidence indicated Aralen alone to have been the culprit (N.T.1940). To now argue "whether" Aralen is responsible for Hoffman's condition would constitute a complete re-trial of the liability issue. The defendants are free to argue that the plaintiff suffered no loss of earnings, or the defendants might argue that the plaintiff's lost future earnings were not the result of the eye condition created by Aralen. However, to the extent that the plaintiff's loss of earnings, if any, are tied to his eye condition, the defendants are foreclosed from denying liability. This court ·will not permit a backhanded attempt to argue liability by letting the defendants explore "whether . . .

that loss was attributable to defendants' negligence" (Defendant's brief, at 9).

On the re-trial relative to compensatory damages the defendants will be limited to argue the extent of Hoffman's chloroquine retinopathy, not its *source*. The defendants will also be permitted to argue the amount of lost future earnings and expenses as well as the relationship between those losses and the condition created by Aralen.

## VOIR DIRE

The plaintiff has proposed certain controversial voir dire questions which the defendants oppose. The first three are directly from Kiernan v. Van Schaik, 347 F.2d 775 (3d Cir. 1965).

> "Are any of you or your immediate families employed by a company engaged in the casualty or liability insurance business."

> "Are any of you or your immediate families stockholders in any company which, in whole or in part, is engaged in the casualty or liability insurance business."

> "Are any of you or your immediate families now or have ever been employed as a claims adjuster or otherwise by a company or concern which, in whole or in part, was engaged in the casualty or liability insurance business."

Kiernan held it error for a trial court to prohibit the above three questions on voir dire. In order to prohibit the proposed questions, this court must conclude that Kiernan is no longer the law of this circuit. The defendants direct the court's attention to Milwaukee Gear Co. v. Charles Benjamin, Inc., 466 F.2d 588, 593 n. 4 (3d Cir. 1972). There the court took cognizance of Bentivoglio v. Ralston, 447 Pa. 24, 288 A.2d 745 (1972) in which the Pennsylvania Supreme Court found no reversible error in *refusing* to ask the trilogy of insurance questions. The court in Milwaukee Gear conceded that Bentivoglio cast "some doubt" on Kiernan but did not have to resolve the conflict since Milwaukee Gear involved an *allowance* of the questions.

The Kiernan court made very clear that it is reversible error to do what the defendants ask of this court. To so rule we would have to first conclude that the law of Pennsylvania controls the substance of voir dire questions in this diversity action. We note that Kiernan arose out of the District of Delaware. It is significant that nowhere in Kiernan did the Court of Appeals expressly or impliedly base its ruling on Delaware law, despite the fact that the case was not based on federal question jurisdiction but apparently on diversity of citizenship.

■ The authorities agree that federal law controls the procedural aspects of jury selection in diversity cases. Federal Jury Practice and Instructions (2d ed.) Vol. 1 § 3.01, at 48; 5A Moore, Federal Practice § 47.02 [1], at 2004.1; Rule 47 Fed.R.Civ.P. However, precisely what constitutes procedure versus substance in terms of Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) is another matter. Wright, Handbook on Federal Courts (2d ed. 1970), at 226. At least one court has posed the precise question facing us, but then retreated from its resolution. Langley v. Turner's Express, Inc., 375 F.2d 296, 297 (4th Cir. 1967).

The ostensible object of Erie was to assure that in a diversity action the same result would obtain in federal court as if the case had been tried in the state forum whose law is applied. To completely achieve the result is virtually impossible. As Professor Wright noted, "almost every procedural rule may have a substantial effect on the outcome of a case." *Wright, supra*, at 226. Indeed, Kiernan established that this circuit finds refusal to allow voir dire on insurance to be so prejudicial (substantive) as to require reversal if barred from use.

If we conclude that Pennsylvania law controls the substance of voir dire questions, then certainly Bentivoglio modi-

fies Kiernan and allows a trial court to exercise its discretion and refuse such questions in appropriate cases. If, however, federal law controls, then Kiernan mandates allowance of the insurance trilogy and renders Bentivoglio irrelevant.

■ This court has carefully read Kiernan and concludes that taken in context our circuit was pronouncing federal law controlling. Nowhere did the Kiernan court even touch state law. Notwithstanding the curious observation in Milwaukee Gear, we feel that once it is shown that insurance coverage has any role in a case a party is entitled to the voir dire approved in Kiernan.

■ As part of voir dire the plaintiff also wishes to inquire of prospective jurors:

"Whether, if you are appropriately satisfied under the evidence and the law, any of you would, for any reason, hesitate to award a substantial verdict or verdicts."

The defendants strongly object to the word "substantial." The court agrees that such an inquiry is inappropriate and should not be allowed, especially if the voir dire is conducted by the court. It is fully enough to inquire of the veniremen if they are willing to award the plaintiff such damages as the evidence may justify.

■ Finally, the plaintiff wishes to explain in some detail to the prospective jury, and presumably to the empaneled jury, the legal history of the case. The court will not permit it. Instead, the court, after a jury is selected will instruct the panel as follows:

Ladies and Gentlemen of the jury: The function you are to perform by your verdict in this trial is to award to Clifton Hoffman such compensatory damages as the evidence warrants. You may also award punitive damages to Clifton Hoffman if the evidence supports such an award. You must render a verdict in favor of the plaintiff Clifton Hoffman. The sole issue is the amount. Liability has already been established. You need not concern yourselves further as to that issue.

I will explain in considerable detail at the close of the case the nature of compensatory and punitive damages and their applicability.

No other reference to prior trial, appellate decisions or legal history will be permitted by counsel or witnesses, in argument or questioning.

Consequently, during voir dire, the plaintiff may ask prospective jurors the trilogy of insurance questions approved in Kiernan. The plaintiff will not be permitted to refer to the legal history of the instant case, nor to inquire about the size verdict a juror might be willing to render.

## EMPLOYMENT DESCRIPTION

Clifton Hoffman graduated from college in 1955 with a degree in Architecture. He never took the architecture licensing examination necessary to become a registered architect, although he had served the required apprenticeship time. At late as May 1969, the plaintiff was working as an architectural draftsman and designer for a Registered Architect in York, Pennsylvania. It was in May 1969 that Hoffman's deteriorating eyesight caused him to resign his job. At that time his salary was $8,100 annually.

The plaintiff wishes to introduce evidence that he had secured an application to take the necessary examination and would have become a registered architect but for the chloroquine retinopathy caused by Aralen. The defendants vigorously argue that plaintiff is foreclosed from "speculation" about future job classification improvements.

At the original trial this court sustained the defendants' objections to testimony regarding potential earning power as an architect. The plaintiff took exception to the court's ruling, but the issue was never the subject of an appeal. The plaintiff contends this court was originally in error and will commit reversible error if we again refuse his at-

tempts to argue that a career as a registered architect loomed on his "economic horizon."

Plaintiff argues that the "economic horizon" test controls the admissibility of evidence regarding potential occupations. In Bochar v. J. B. Martin Motors, Inc., 374 Pa. 240, 244, 97 A.2d 813, 815 (1953), the court noted:

> "It is not the status of the immediate present which determines capacity for remunerative employment. Where permanent injury is involved, the whole span of life must be considered. Has the economic horizon of the disabled person been shortened because of the injuries sustained as the result of the tortfeasor's negligence? That is the test. . . ." (Emphasis supplied)

Frankel v. United States, 321 F.Supp. 1331 (E.D.Pa.) involved a 19-year old girl studying commercial art, but rendered totally disabled by an accident. Judge Sheridan applied the economic horizon test (Id., at 1337) and considered her progress in school, samples of her work and family history. Frankel stands for the proposition that a plaintiff is not automatically bound to lost future earnings computed on the basis of the job held at the moment of the injury.

The defendants do not seriously dispute the notion that potential occupations may be the subject of lost future earnings. Instead, they argue that the economic horizon test is limited to two classes of plaintiffs: those *fully* qualified to embark on the particular career, but not yet so employed; and those, such as minors, for whom there exists little or no education or employment history. The defendants describe the latter as the "best evidence" rule of earning power. The instant plaintiff is well past majority and has a substantial employment history—and consequently fails to meet the test of the latter category. Likewise, by strictly applying the term "qualified" the plaintiff fails to qualify as a Registered Architect.

During oral argument defense counsel also argued that the plaintiff's proposed profession was licensed, that mere educational training is insufficient, and that a rigorous test lay ahead before Hoffman could have practiced his desired profession. Defense counsel seemed to take the position that a plaintiff aspiring to a profession subject to licensing may not raise the likelihood of his entering that occupation.

In effect, the defendants would limit the economic horizon test to those people fully prepared to embark on a profession or those with virtually no employment background. In no event, however, would the defendants allow a plaintiff to submit evidence on a licensed profession.

■ We have considered the defendants' arguments and find them unnecessarily restrictive. Such an analysis implies that people do not advance their stations in life, even in middle age. Even more unrealistic, the defendants' position would preclude dozens of professions such as barbers, beauticians, morticians, attorneys, physicians, etc., and the list goes on. To apply the defendants' argument, the estate of a plaintiff killed days before graduation from medical school would be precluded from arguing that he would likely have been a physician. A young lady with an employment history as a housewife could complete beautician school courses but be precluded from introducing such testimony merely because she had not yet received the needed state licensing. What of the high school teacher who laboriously spends years completing graduate school in his spare time in the hopes of becoming a college professor? Is his estate precluded from so arguing because he died before completion of his thesis? We think not. The notion that licensing or certification is a dispositive characteristic is a specious argument which if adhered to would create a precedent for grossly inequitable results. Nor do we think the grim statistics on the percentage who fail the architecture examination to be dispositive

of admissibility. Such material goes only to weight.

The defendants make much of the fact that Clifton Hoffman served as a draftsman for several years after becoming eligible for the architectural examination. We do not find this dispositive of the issue of admissibility. It is, however, good argument for the jury that Hoffman lacked motivation to ever progress.

 We conclude, therefore, that the test is not the age, preinjury occupation, nor the nature of the proposed profession, but rather the sufficiency of the plaintiff's evidence in showing his skill, likelihood of becoming a member of the profession and availability of work in that area. The defendants are protected against wholly speculative testimony by seeking an instruction in the charge directing the jury to disregard the testimony if the plaintiff fails to provide sufficient evidence to allow the jury's consideration of the matter.

## TESTIMONY OF DENTON JORDAN

 The defendants urge that at the upcoming trial the court refuse to admit testimony concerning the "Bagnell letter." The contents of the letter were admitted into evidence at the first trial through the testimonial sponsorship of Denton Jordan, Court Reporter for the United States District Court for the Southern District of Mississippi. Mr. Jordan's testimony and the letter are explained in detail at 485 F.2d 139–140.

Briefly, the letter was apparently by and to physicians employed by the defendants containing discussions of adverse side effects from Aralen. Appended to the letter by a staple was a handwritten note which advised that it not be shown to the Food & Drug Administration. Jordan identified the letter and note as part of the evidence file of a case involving Aralen in a Mississippi trial.[5]

The attached longhand note was unsigned and did not specify that it referred to the letter regarding Aralen.

On appeal from the original verdict the defendants contended that it was error to admit the letter and note into evidence since Mr. Jordan had no personal knowledge of how the letter and note became attached. The circuit noted:

"Although we find the connection between the letter and the note extremely remote, we believe that the error in admitting this evidence was harmless. F.R.Civ.P. 61. The evidence was relevant to the allegations of fraud and concealment contained in Count IV of the complaint. But the district court judge submitted the case to the jury only on the theories of negligence and strict liability (alleged in Counts I and III of the complaint), and the evidence with regard to these issues was such that the jury's findings on these issues could not have been significantly influenced by admission of evidence on the fraud count." 485 F.2d, at 140.

The preceding language by the circuit is footnoted by the court's observation that, " . . . the evidence that . . . the defendants failed to use reasonable care to warn of the danger, is most persuasive." *Id.* at *n.* 26. Here, as elsewhere throughout this case, the parties are at complete odds on the issue. The plaintiff, wishing to again introduce the letter and note, contends that the "error" referred to by the circuit was the irrelevance of the document in view of this court's refusal to submit the issues of fraud and concealment to the jury. As the plaintiff argues, the circuit made clear that the letter and note were relevant to the allegations of fraud and concealment.

The defendants take the position that the "extremely remote" connection between the letter and note renders any admission of the documents error per se as pure speculation.

5. Counsels' arguments and Mr. Jordan's testimony at the original trial are found in the notes of testimony at 638–735.

The court has closely re-examined the transcript surrounding the offer of proof by the plaintiff, and Mr. Jordan's subsequent testimony on the documents. We conclude that the admission of the disputed documents was indeed error and that the Court of Appeals found it "harmless" solely because they could have had no impact on the claims of negligence and strict liability. However, at re-trial the documents will relate directly to the claims of fraud and concealment. If the erroneous admission is repeated it would certainly become harmful error. The Appellate Court significantly noted that a "breach of the duty to warn would result in liability under both negligence *and* strict liability theories." 485 F.2d, n. 26, at 140. (Emphasis in original) That observation was a footnote to the discussion of the admission of the documents. It seems to bolster the argument that error was committed notwithstanding the absence of counts of fraud and concealment in the original trial. This court readily appreciates that the circuit's ruling is subject to the interpretations given to it by both sides. Nevertheless, in context, we conclude that the Court of Appeals found the admission to be error per se.

At the re-trial of this case the plaintiff will not be permitted to introduce the documents in question.

## OTHER DRUGS

■ The plaintiff was denied permission at the first trial to introduce evidence on the known side effects of drugs allegedly chemically related to Aralen. The court's ruling was not assigned as error in the plaintiff's cross appeal.

Plaintiff again seeks approval to admit evidence at the retrial on the amino quinoline series of drugs: plaquenil, triquin, atabrine and chloroquine. The plaintiff argues that the amino quinoline series is chemically "quite similar" to Aralen and that the differences between the drugs in the series and Aralen do not involve toxicity. Sterling, according to the plaintiff, allegedly had actual knowledge that the drugs in the series caused blindness or injury or both to the macular area of the eye. Such evidence, the plaintiff submits, is directly relevant to the issue of whether or not Sterling knew or should have known of Aralen's side effects.

The defendants hotly contest such evidence on the grounds that failure to assign as error the court's original ruling waives the plaintiff's right to re-submit the issue and that such evidence would open a legal Pandora's Box.

The plaintiff's failure to pursue the court's ruling on the original appeal may foreclose the issue on re-trial. Slaughter v. Phila. Nat'l Bank, 417 F.2d 21, 33 n. 21 (3d Cir. 1969). More fundamental, however, is the defendants' attack on the substance of the proposed evidence. Were this court to allow the plaintiff to fully argue such a case by chemical analogy, then we would be compelled to grant the defendants the opportunity to lengthy rebuttal to disprove the alleged similarities between the series and Aralen.

In order to adequately establish the needed connection the jury would be subjected to large quantities of obtuse expert testimony directed toward drugs which at best are "quite similar." From that foundation the jury would be expected to extrapolate a conclusion that the defendants should have known Aralen's dangers. The dubious value of such evidence is made apparent when one considers that the liability issue was foreclosed by the first trial. Thus, the evidence of other drugs could be directed only to the question of punitive damages.

The only precedent offered by the plaintiff is Hoffman-La Roche, Inc. v. Kleindienst, 478 F.2d 1 (3d Cir. 1973). The case is completely inapposite. It involved a "special statutory proceeding against the . . . Attorney General of the United States . . . to review a Final Order issued by the Director [of the Bureau of Narcotics and

Dangerous Drugs]." The administrative decision appealed by the manufacturer was a determination that two drugs were potentially dangerous and required close governmental supervision. The opinion of Judge Biggs makes clear that the prime issue was procedural due process. 478 F.2d, at 25. The Director of the said Bureau has substantially more expertise than a jury of laymen. Moreover, the function he performs requires a different standard of scrutiny than a jury in a civil damage action. To apply Hoffman-La Roche by analogy to the instant case would not only mislead the factfinder but greatly prolong the trial.

Therefore, the plaintiff will be prohibited at the retrial from presenting evidence regarding the amino quinoline series of drugs.

## VETERANS ADMINISTRATION AND BUREAU OF VISUALLY HANDICAPPED RECORD [6]

The defendants have urged the court to admit into evidence records relevant to Hoffman kept by the Veterans Administration (VA) and the State's Bureau for the Visually Handicapped (BVH).[7] These records were apparently unknown to the defendants until recently. Consequently, the court has never passed on the issue.

 Plaintiff, presumably a veteran, sought benefits from the VA as a result of his visual handicap. As a prerequisite to such benefits, Hoffman was examined by a VA physician, questioned, and asked to complete various forms. The defendants' brief specifies the proposed uses of the VA records at trial. First, they wish to show that a VA physician found the plaintiff's eyesight to be 20/50 rather than 20/200 as he claims. Second, that such a finding shows a 30% disability as opposed to the 100% blindness asserted by the plaintiff. Third, that the plaintiff's attorney attempted to "oust" the VA physician in question. Fourth, the defendants propose to introduce a VA insurance application which allegedly contains fraudulent representations by Hoffman regarding his medical history and condition. The court has examined the relevant law and reluctantly concludes that the clinical observations by the VA doctor which diagnosed Hoffman's vision at 20/50 are admissible. The law of this circuit is articulated in Rivers v. Union Carbide Corp., 426 F.2d 633 (3d Cir. 1970). The Rivers court observed:

"Under the statute, admissibility is predicated upon satisfying two requirements. The record must have been made in the regular course of business, and it must have been the regular course of business to make such record contemporaneously or within a reasonable time. If these two requirements are satisfied, the document is admissible. All other circumstances surrounding the making of the entry may be shown to affect the weight the record should be accorded.

. . .

* * * * * *

"There is, however, some controversy as to whether all entries of observations of a diagnostic nature are admissible. In several instances, hospital records which contained conclusory observations were held to be inadmissible evidence. Primarily, they were excluded because the diagnoses contained in the records were not based on directly observable facts and were not observations that everyone skilled in the profession would be likely to reach. . . .

* * * * * *

"In the present case the factors which have led other courts to exclude hospital records are not present. The observation is certainly the type of observation that the trained eye of a

---

6. We note that the court has not been provided copies of the records in question.

7. The defendants contend that 28 U.S.C. §§ 1732, 1733, and 28 P.S. § 121 control the admissibility of the documents.

doctor could make with reasonable accuracy. [intoxication] . . . .

"[The plaintiff] . . . contends that the conclusory nature of the disputed entry in this case renders it inadmissible. Such a proposition is untenable. The argument only may be used to affect the weight that should be accorded to the record." (Footnotes omitted) 426 F.2d at 637–638.

The Rivers court relied upon Thomas v. Hogan, 308 F.2d 355 (4th Cir. 1962) which similarly held that conclusory medical examination results are admissible when the criteria above-noted are present. Although an eye examination requires some additional expertise, the test is whether the facility in question and particularly the examining physician customarily conduct such examinations. Certainly an ordinary vision examination is not typically so unusual so as to constitute an exception to Rivers. In Woods v. Nat'l Life And Accident Ins., 347 F.2d 760, and 380 F.2d 843 (3d Cir. 1967), the court found it reversible error to exclude a VA report in which a doctor made a conclusory diagnosis detailing a severe pulmonary condition. See also, McCormick, Handbook on Evidence (2d ed. 1972) at 730–33. In short, at the upcoming trial the conclusion of the VA doctor regarding the extent of the plaintiff's visual impairment will be admissible if the defendants satisfy the prerequisites of Rivers and show that the eye test in question was within the ordinary competency of the examining physician.

▆▆▆▆▆ The defendants also seek to use certain portions of the VA records to impugn the honesty of Mr. Hoffman by showing that he gave false information to the VA in an attempt to secure certain benefits. The court will not permit a collateral attack on the plaintiff's credibility. However, the defendants will be permitted to use the plaintiff's VA application to impeach his credibility insofar as he testifies on direct in a fashion contrary to the data he provided the VA. Rivers, supra, 426 F.2d at 639.

Any evidence concerning actual VA benefits received by Hoffman would, of course, be inadmissible.

The court does not understand the defendants' argument concerning plaintiff's counsel's attempt to "oust" the VA doctor. Consequently, the issue will not be subject to argument at the upcoming trial.

▆▆▆▆ The BVH records present a different problem. The defendants wish to use the records to show that an agency of the Commonwealth of Pennsylvania evaluated Hoffman and his records, and found him to be employable. We conclude that such an agency finding is inadmissible as going to a "critical issue" to be resolved by the jury. Raycraft v. Duluth, Missabe And Iron Range Rwy. Co., 472 F.2d 27, 31 (8th Cir. 1973). A crucial question for the jury will be the extent of Hoffman's impairment and the type of employment available to him, if any.

▆▆▆▆ The defendants wish to use the BVH records to establish that the plaintiff offered himself for rehabilitation when this court refused a new trial motion, but after securing a new trial from the circuit declined to cooperate until the completion of the second trial. Refusal to mitigate damages is certainly relevant for argument to the jury. However, this court has no intention of explaining the legal history of this case to the new jury. As a consequence, we will not allow the defendants to use the heavy implications concerning re-trial to impugn Hoffman's willingness to mitigate damages. The defendants may establish that from a certain date the plaintiff has refused to submit to rehabilitation programs offered by the BVH.

NUMBER OF JURORS

▆▆▆▆ The breadth of the disagreements between counsel extends even to the number of jurors to be empaneled at the forthcoming re-trial. At the original trial the court empanelled a jury of 12 as required in this district. During the pendency of the appeal the Middle

District adopted Local Rule 401.11 allowing a panel of 8 jurors in a civil case. The rule also states that so long as at least 6 remain to render a final verdict, such verdict shall be valid.

The defendants urge this court to empanel a full jury of 12, notwithstanding the court's authority under Rule 401.11. The plaintiff requests that the court limit the jury to 8 members.

We note first that our local rule states: "Juries in civil cases shall consist, initially of at least eight (8) members . . . ." Nothing in the rule sets a maximum of 8, and by implication, therefore, would allow the trial judge to enlarge the panel. This court does not view the size of a petit jury as a substantive matter, but rather a procedural one aimed at greater judicial economy. Consequently, no matter how the court might rule, neither side could seriously claim prejudicial error.

The court sees no point in enlarging the usual size of our jury panel with its attendant changes in the number of challenges. Therefore, at the upcoming trial the parties shall select a jury of 8 persons.

## INTERLOCUTORY APPEAL

This court has carefully considered the nature of this case and the impact of our rulings today on the outcome of the retrial. We conclude that the instant case is precisely the type of situation meant for an appeal pursuant to 28 U.S.C. § 1292(b). *See generally,* Katz v. Carte Blanche Corp., 496 F.2d 747 (3d Cir. 1974).

At least one or more of today's rulings involve "controlling questions of law" which offer "substantial ground for a difference of opinion" and which, if immediately appealed, would "materially advance the ultimate termination of the litigation." Katz, *supra,* at 754. Those questions herein decided which may not be controlling are nevertheless thorny issues subject to resolution by the appellate court. Johnson v. Allredge, 488 F.2d 820 (3d Cir. 1973).

The instant case satisfies both definitions of a controlling question in that our orders, if erroneous, would be reversible error on appeal, and immediate resolution of the questions would render a substantial savings in time.

We conclude that the issues of future monetary trends and the nature of the punitive damage question go to the heart of the re-trial, presenting problems for which no precise resolution now exists. Likewise, the liability issue raised by the defendants, and the proposed testimony of Denton Jordan raise problems of a potentially controlling nature. The impact of the rulings on the VA and BVH records and the proposed voir dire will be substantial, although the law in question is not as subject to a substantial difference of opinion. Johnson v. Alldredge, *supra.*

The court hereby certifies that the instant opinion raises controlling questions of law best suited for pre-trial disposition pursuant to 28 U.S.C. § 1292(b).

It is so ordered.