Samuel Dwane THOMAS, M.D.

v.

**AMERICAN CYSTOSCOPE MAKERS, INC., et al.**

Civ. A. No. 72–1370.

United States District Court, E. D. Pennsylvania.

May 5, 1976.

Jerome H. Ellis, Philadelphia, Pa., for plaintiff.

Gerald A. Dennehey, Philadelphia, Pa., for defendant.

Swartz, Campbell & Detweiler, Philadelphia, Pa., for Medesco, Inc.

White & Williams, Philadelphia, Pa., for third party defendant.

## OPINION

JOHN MORGAN DAVIS, Senior District Judge.

On May 26, 1971, the plaintiff, Doctor Samuel Dwane Thomas, then a urology resident at Episcopal Hospital, was performing a transurethral prostatectomy using a surgical instrument known as a resectoscope. Suddenly, in the midst of the operation, the instrument malfunctioned, and Dr. Thomas

suffered an electrical burn of the cornea of his right eye. He brought suit against the manufacturer, American Cystoscope Makers, Inc. (ACMI) and various other defendants,[1] basically asserting that the resectoscope was defectively designed and had caused his injury. Following a series of last minute events shortly before and at the outset of trial, the case ultimately was tried against ACMI alone on a theory of strict liability in tort under § 402A of the Restatement of Torts (Second). The jury found in favor of the plaintiff and returned a verdict awarding $475,000 compensatory and $200,000 punitive damages.

We have before us the motion of defendant ACMI for judgment n. o. v. and in the alternative, for a new trial. Before we consider the whole host of arguments that have been raised, it is appropriate that we recite briefly the factual background of the case.

The crux of the action, of course, is the product itself. The device in question here is an instrument commonly used in urological surgery. It is part of a complex and highly sophisticated electro-surgical unit and is comprised of several component parts. Chief among them, and relevant for our consideration, is an optical telescope (a cystoscope) which permits so called closed surgery by insertion of the instrument directly into the patient's body. The surgeon is able to see and to operate internally by viewing through a monocular eyepiece affixed to the end of the telescope shaft. When incorporated with other component parts, including a resectoscope working element, cutting loop, and sheath, and connected to a light source and electrical power supply known as a Bovie machine, the instrument is complete. In its integrated configuration, the resectoscope is hand-held and measures approximately 15 inches in

---

1. In addition to ACMI, plaintiff originally sued Medesco, Inc., which was the company that serviced the electro-surgical power supply used in conjunction with the resectoscope, and he also brought a separate action (Civil No. 73–996) against Ritter-Sybron Corp., which manufactured that machine. ACMI subsequently joined Episcopal Hospital as a third-party de-

fendant. At the time of trial, on the basis of a stipulation by counsel, the action as to Ritter-Sybron was dismissed, and it is not now before us. At the same time, the Court directed verdicts in favor of Medesco and the Episcopal Hospital. ACMI challenges these latter rulings in its present motions, which matter will be discussed below in Part IV.

length. The surgical function is accomplished by means of high frequency electrical energy supplied by the Bovie machine to the resectoscope cutting loop.

ACMI manufactured and sold two basic types of eyepieces: a standard eyepiece and what was termed a photographic eyepiece, which permitted a camera or other attachments to be used with the instrument for purposes other than direct viewing. Dr. Thomas, however, at the time of his injury, was using a resectoscope equipped with a photographic eyepiece with his naked eye.

On the day of the incident, Dr. Thomas was performing surgery under the supervision of Dr. Morton Bogash, who was then the head of the hospital's Urology Department. According to their testimony, as the operation progressed, the instrument began to get warm. At times, they also experienced a tingling sensation or minor shocks to their hands which apparently were relatively common occurrences in the use of resectoscopes. The warming effect, however, was something that neither surgeon had felt or heard of before. Twice during the procedure, the resectoscope and its various connections were inspected and parts changed, but on each occasion, the operation proceeded. In fact, Dr. Thomas testified that he still felt that the instrument was heating up until the moment of his injury. Then as he described, "I felt almost like a blow in my right eye as though I had been hit with a fist and it knocked me backwards and I had no discomfort for maybe up to a minute, it felt like there was a lash or something in my eye and the pain became very intense. . . ."[2]

The essence of plaintiff's liability theory was that the photographic eyepiece was not fully insulated and that this constituted a design defect which rendered the product unreasonably dangerous to its users or at least required ACMI to warn physicians against foreseeable hazards.[3] There was substantial dispute as to exactly how plaintiff's injury occurred. Whether or not the assigned defect was a proximate cause of defendant's injury also produced conflicting evidence as did other contentions ACMI raised in defense. But while these matters were at issue, the fact that in some manner electrical current was caused to pass from the eyepiece at the ocular end of the instrument into plaintiff's eye cannot be seriously contested.

Plaintiff suffered a corneal burn which resulted in significantly impaired vision for several months. Subsequently, there was some improvement, but according to the testimony, Dr. Thomas still had a permanent residual impairment. Although he had, even up until the time shortly before trial, been able to engage in the full range of activities in his practice as a urologist, albeit with difficulty, there was substantial evidence that plaintiff has been, and will continue to be limited in the future in his professional activities, and otherwise, particularly with regard to his ability to perform endoscopic surgery by virtue of the injury to his eye.[4]

The post-trial motions of ACMI raise the following main contentions:

ACMI seeks judgment notwithstanding the verdict urging that plaintiff failed to establish a causative link between the resectoscope's alleged defect and his injury; in addition, ACMI urges that it is entitled to judgment as a matter of law on liability because Dr. Thomas misused its product and further that he assumed the risk of injury. Defendant also demands judgment

---

**2.** N.T. 11–6–74 at pp. 76–77.

**3.** Indeed, it is the defendant's alleged conduct in failing to warn physicians and in continuing to market its unsafe product in the face of knowledge that it could cause great harm which plaintiff contends demonstrated reckless indifference to the interests of others on the part of the defendant, which is the basis for his claim for punitive damages.

**4.** This summary deliberately omits reference to the evidence and testimony on the question of punitive damages, which, in the Court's view, is the most troubling aspect of this case. Because the primary issue is the sufficiency of the evidence to sustain this part of the award to plaintiff, a thorough review of the evidence in necessary, which we will discuss in more detail in Part II, infra.

n. o. v. on the issue of punitive damages alleging the gross insufficiency of the evidence. In the alternative, it urges numerous arguments in favor of awarding a new trial on punitive damages primarily with regard to the admission of evidence. ACMI further charges that the Court made various errors at trial as to the issue of compensatory damages, claiming that there was no proper evidence on which the jury could base or calculate an award for future loss of earnings. Finally, ACMI raises a variety of miscellaneous matters which, it asserts, mandate the granting of a new trial.

We will consider these points *seriatim,* and of course, in doing so, we must view all of the testimony and inferences therefrom in the light most favorable to the plaintiff, who was the verdict-winner. 5A Moore's Federal Practice § 50.07[2].

## I. MOTION FOR JUDGMENT N. O. V. LIABILITY

ACMI's most serious contention on liability is that plaintiff failed to establish that the specific defect in the resectoscope in fact caused his injury. The narrow argument which is advanced focuses on what is claimed to be a fatal inconsistency in plaintiff's proof.

The central factual allegation postulated by plaintiff was that his eye was burned when an electrical current passed from the instrument's eyepiece by a phenomenon commonly called "arcing", since admittedly there was at least some distance between his eye and the eyepiece at the critical moment of the incident. Indeed, at trial, there was considerable testimony from no less than five expert witnesses as to how, if at all, and under what circumstances, this "arcing" might occur. But, as defendant readily points out, no one, including Dr. Thomas, could positively identify the source or the cause of this unexplained, erratic current.

Defendant argues from his own assessment of the evidence that all of the engineering experts agreed that, absent some abnormal or extraordinary occurrence in the functioning of the surgical unit which might cause "arcing" to occur, the plaintiff would not have sustained an electrical shock without virtually direct contact with the uninsulated eyepiece. It follows, according to defendant's syllogism, that since Dr. Thomas emphatically testified that there was no such contact, that "the jury . . . could only find causation by ignoring the evidence and grounding its verdict on shearest (sic) of speculation" (Defendant's Reply Brief at p. 7). Thus, ACMI concludes that plaintiff succeeded only in proving that he was not injured as he theorized.

The attention which ACMI draws to this apparent contradiction in plaintiff's case is misplaced. As the Court sees it, the real thrust of its argument, although not clearly stated, is not the conflict itself, but rather that there was no valid basis on which the jury could have resolved that conflict in plaintiff's favor. Factually, this calls into question whether or not there was sufficient evidence for the conclusion that Dr. Thomas was injured without actual contact with the eyepiece of the resectoscope or, in other words, that an "arcing" effect actually occurred. Tested against the legal standards on the quantum of evidence necessary to establish a jury question on the issue of causation, we think that there clearly was.

No one would dispute that the uninsulated eyepiece itself did not cause plaintiff's injury; it was after all only a passive condition. Necessarily, to have caused an electrical shock, some other operative force or forces must have acted upon it. As noted earlier, however, none of the expert witnesses who testified at trial presumed to unequivocally describe the physical mechanism that actually resulted in the conduction of current to the eyepiece. Possible explanations were offered by the various witnesses including the malfunctioning of the Bovie power supply, an unexplained surge in current, or other malfunction of the resectoscope itself, in particular, the apparently common occurrence of the highly charged cutting loop inadvertently coming into contact with the telescope shaft.

Yet whatever may have been the exact sequence of events the fact remains that Dr. Thomas received a severe electrical shock. While in this case only circumstantial proof was available it was certainly within the province of the jury to find as a matter of reasonable inference that the essential facts occurred.[5] Indeed, this is the specific function which we delegate to the jury.

In determining the sufficiency of the evidence for submission to the jury, we must be guided by the Pennsylvania courts and the concise statement of the law in *Smith v. Bell Telephone Co. of Pa.*, 397 Pa. 134, 138, 153 A.2d 477 (1959):

"We have said many times that the jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but that there must be evidence upon which logically its conclusion may be based. . . . (citations omitted). Clearly this does not mean that the jury may not draw inferences based upon all the evidence and the jurors' own knowledge or experiences, for that is, of course, the very heart of the jury's function. It means only that the evidence presented must be such that by reasoning from it, without resort to prejudice or guess, a jury can reach the conclusions sought by plaintiff, and not that that conclusion must be the *only* one which logically can be reached. . . .

It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability. . . ."

■ The test on the issue of factual causation is simply whether or not the jury could reasonably find that but for the existence of a defect in the product, the plaintiff would not have been injured.[6]

■ We have no doubt in this case that there was a sufficient evidentiary foundation on which the jury could have concluded, as a matter of reasonable inference, that Dr. Thomas was injured by the "arcing" of electrical current from the uninsulated eyepiece of defendant's product.[7] The fact that plaintiff could not prove such an occurrence directly is of no import. The circumstantial evidence alone was enough. *Smith v. Bell Telephone Co. of Pa.*, supra. Indeed, this concept finds support in the specific context of products liability cases where it is often impossible to establish by direct evidence the causal connection between an injury and a specific defect in the manufacture or design of the product. It is well recognized nonetheless, that circumstantial proof alone presents a sufficient basis for submission of the question of liability to the jury. Cf. *MacDougall v. Ford Motor Co.*, 214 Pa.Super. 384, 257 A.2d 676 (1969); *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914 (1974); and see, *Kridler v. Ford Motor Co.*, 422 F.2d 1182 (3d Cir. 1970).

---

**5.** Defendant does not argue that plaintiff was not injured or presumably that he did not sustain an electrical burn. Nothing else appears in the evidence to even remotely suggest that anything other than the resectoscope caused plaintiff's injury. Thus, unless we subscribe to a *deus ex machina* theory of events, it is hard to imagine what else actually happened. As noted by the court in *Masciangelo v. Dolente*, (1972) 222 Pa.Super. 368, at 372, 295 A.2d 98, at 100: "Any such finding would have required the court to indulge in speculative assumptions that extraordinary circumstances might have existed which, if established, made the only reasonable inference untenable."

**6.** As applied in Pennsylvania, the specific test is based on § 432(1) of the Restatement of Torts (Second). See, *Frangis v. Duquesne*

*Light Company*, 232 Pa.Super. 420, 335 A.2d 796 (1975).

**7.** We emphasize that the issue defendant has presented is solely that of causation in fact. ACMI has in no way challenged the sufficiency of the evidence as to whether the defect was a "substantial factor" in causing plaintiff's injury. The distinction between proximate and factual causation is noted in *Flickinger Estate v. Ritsky*, 452 Pa. 69, 305 A.2d 40 (1973), in which the court stated: "The latter is invariably a question of fact; the former 'is essentially a problem of law . . . whether the defendant should be legally responsible for what he has caused.' (citation omitted)." 452 Pa. at 73–74, 305 A.2d at 43.

■ This was not a case in which expert testimony was essential to establish the causal connection between plaintiff's injury and defendant's product. Nor was it one involving incontrovertible physical facts which were subject to but one set of inferences or one reasonable conclusion. To the contrary, it was a case whose evidence required the resolution of conflicting testimony, the assimilation of factual circumstances and opinion and the formulation of conclusions based on the reasonable inferences deducible therefrom, all of which describe the classic indicia of an issue properly to be decided by the jury. Insofar as defendant would, at this junction, have the Court conclude otherwise, the Motion for judgment n. o. v. is denied.[8]

The remaining two contentions which defendant raises regarding liability can be disposed of more briefly.

First, ACMI argues that we should reverse the jury's verdict because plaintiff misused its product on the occasion of the accident by using it with a photographic eyepiece rather than the standard eyepiece with which it was supplied.[9] It is contended that the photographic eyepiece was neither designed nor intended by ACMI for direct viewing.

■ A manufacturer's subjective intentions, however, are not controlling. Rather, the issue raised by the defense of misuse is "whether the 'use' to which the product was put was intended or *foreseeable* (*objectively reasonable* by the defendant)—(Emphasis supplied)." *Eshbach v. W. T. Grant's and Co.*, 481 F.2d 940 (3rd Cir. 1973); cf. *Dyson v. General Motors Corp.*, 298 F.Supp. 1064 (E.D.Pa.1969). In this particular case, it is apparent that the jury could well have

found that Dr. Thomas' use of the instrument was not unanticipated. In fact, there was affirmative evidence which disclosed not only that ACMI could reasonably have foreseen the use of its photographic eyepiece for direct viewing, but also that it knew as long as two years before the incident we deal with here, that surgeons were actually doing so. (See, N.T. 11–11–74 at pp. 116–121; 11–12–74 at pp. 70–71).

■ There was more than ample evidence to support the jury's conclusion, and for that manner, sufficient basis on the record for the Court to have ruled on the issue as a matter of law in plaintiff's favor. In short, we believe that we gave defendant more benefit than was deserved from this defense by submitting it to the jury at all. There clearly was no error.

Defendant's final liability contention involves the defense of assumption of risk.[10] The argument is based solely on the fact that the plaintiff admitted he knew on the day of the occurrence that the resectoscope was not operating properly. Defendant asserts, therefore, that since Dr. Thomas continued to use the instrument with this knowledge, he assumed the risk of injury and recovery is barred as a matter of law.

But the limited extent of plaintiff's awareness of the risk appears in his own testimony where he described how the instrument was functioning:

"the metal part, this portion of the resectoscope was becoming warm as the operation was going on and even the water supply . . . was getting warm. I had never felt this before and the warming of this machine and the shocks, repeated shock being delivered to me

---

**8.** Aside from all of the foregoing discussion, however, we note that in any event, because this ground was not raised in its motion for a directed verdict, ACMI is now precluded from asserting it as a basis for the entry of judgment n. o. v. *Budge Mfg. Co. v. United States,* 280 F.2d 414 (3d Cir. 1960).

**9.** The concept of "misuse" as a defense to liability derives from Comment h, § 402A of the Restatement of Torts (Second) which states, in part: "A product is not in a defective condition

when it is safe for normal handling and consumption." Cf. *Bartkewich v. Billinger*, 432 Pa. 351, 247 A.2d 603 (1968); see also, *Dorsey v. Yoder Company*, 331 F.Supp. 753 (E.D.Pa. 1971).

**10.** Pennsylvania has adopted Comment n, § 402A of the Restatement of Torts (Second), which allows this defense. *Ferraro v. Ford Motor Company*, 423 Pa. 324, 223 A.2d 746 (1966).

caused me to stop . . . and to ask Dr. Bogash to come into the room and examine the equipment."[11]

Moreover, plaintiff testified that he did not learn of the true nature and extent of the danger in using uninsulated eyepiece until shortly before the time of trial.

■ As defendant aptly concedes, the focus of this defense is necessarily on the subjective facts of what Dr. Thomas actually knew, understood and appreciated. *Elder v. Crawley Book Machinery Co.*, 441 F.2d 771 (3rd Cir. 1971); *Clarke v. Brockway Motor Trucks*, 372 F.Supp. 1342 (E.D. Pa.1974). The most that can be attributed to the plaintiff in this case is that he was aware that something was wrong with the overall unit with which he was working. This knowledge, alone, falls far short of a subjective perception and appreciation of the particular risk of harm that ultimately resulted, which is required to invoke assumption of the risk. See, *Dorsey v. Yoder Company*, 331 F.Supp. 753 (E.D.Pa.1971). Defendant offers further that plaintiff continued to use the malfunctioning resectoscope despite the fact that others were available in the operating room as substitutes. But the suggestion that this makes any difference is unfounded since an essential part of the defense is whether or not the injured party *"unreasonably* proceeded to use the product or encounter a known danger." *Ferraro v. Ford Motor Co.*, 423 Pa. 324, 223 A.2d 746 (1966).[12] It simply was a matter for the jury.

Ultimately, when the evidence is viewed in the light most favorable to plaintiff, there is some doubt whether defendant sufficiently made out even a question for the jury on this defense, let alone that it is now entitled to judgment n. o. v. As before, however, the issue was submitted to the jury. Its determination in favor of the plaintiff is adequately supported by the law and the evidence.

11. N.T. 11–8–74 at pp. 97–98.

12. Cases such as *Bartkewich v. Billinger*, supra, and *Green v. Parisi*, 478 F.2d 313 (3d Cir.

## II. MOTION FOR JUDGMENT N. O. V. PUNITIVE DAMAGES

ACMI presses its most vigorous argument with regard to the sufficiency of the evidence to sustain the jury's award of punitive damages. Before reviewing the evidence in detail, however, our attention must first be directed to several matters relating to the imposition of punitive damages in the context of products liability cases, particularly as they affect the view we take in passing on the evidence itself.

In the general realm of tort law, Pennsylvania has long recognized the rule of punitive damages set forth in § 908 of Restatement of Torts and the comments thereunder. Section 908(1) provides that "Punitive damages are damages other than compensatory or nominal damages awarded against a person to punish him for his outrageous conduct", that is, "for acts done with a bad motive or with a reckless indifference to the interest of others" Comment b, § 908 Restatement of Torts; *Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355 (1963); *Focht v. Rabada*, 217 Pa.Super. 35, 268 A.2d 157 (1970); *McSparran v. Pennsylvania Railroad Co.*, 258 F.Supp. 130 (E.D.Pa.1966). Significantly, in terms of policy considerations, "Pennsylvania adheres to the orthodox view that punitive damages are in no sense intended as compensation to the injured plaintiff. They are, rather, a penalty imposed to punish the defendant and to deter him and others from similar 'outrageous' conduct (citations omitted)." *Esmond v. Liscio*, 209 Pa.Super. 200, 212, 224 A.2d 793, 799 (1966); see also, *Thompson v. Swank*, 317 Pa. 158, 176 A. 211 (1934).

■ The law is also clear that "in determining the amount of punitive damages, not merely the [conduct] itself must be considered, but all of the surrounding circumstances, including the motives of the wrongdoer, and the relations between the parties." *Hughes v. Babcock*, 349 Pa. 475,

1973) which defendant has cited, are readily distinguishable on their facts.

481, 37 A.2d 551, 554 (1944); *Chambers v. Montgomery*, supra. Furthermore, "punitive damages may not be recovered in Pennsylvania absent a showing of actual damages, *Hilbert v. Roth*, 395 Pa. 270, 149 A.2d 648 (1959)" and "punitive damages, if recovered, must bear a reasonable relationship to the amount of actual damages. *Givens v. W. J. Gilmore Drug Co.*, 337 Pa. 278, 10 A.2d 12 (1940)." *Suflas v. Cleveland Wrecking Co.*, 218 F.Supp. 289, 290 (E.D.Pa. 1963); and see, *Hoffman v. Sterling Drug, Inc.*, 374 F.Supp. 850 (M.D.Pa.1974); Comment, 75 Dick.L.Rev. 585 (1971).

Applying these principles in the field of products liability, however, raises a unique set of problems not before encountered with regard to punitive damages. Illustrative is the case of *Hoffman v. Sterling Drug, Inc.* supra, the one case under Pennsylvania law to have dealt with the subject.[13]

In his Opinion following remand on the issue of punitive damages, Judge Herman identified the key problem as follows:

"The plaintiff's counsel contends that punitive damages are imposed to punish an outrage to society. Therefore, he argues, the relevant evidence need not be restricted to the plaintiff Hoffman, but includes the impact of Aralen [the product] on the whole of society (presumably limited to those who actually consumed Aralen). As this Court understands plaintiff's argument, he would argue to the jury that punitive damages should be assessed against Sterling in an amount reflecting the wrong perpetrated against

Hoffman and all like consumers of Aralen." 374 F.Supp. at p. 856.

But, this expansive argument was rejected. Finding that "the computation of the punitive damage verdict, if any, must be a reasonable sum in relation to the defendant's conduct vis-a-vis the plaintiff", the court therein held that the plaintiff could "collect his reasonable portion of the punitive damages the defendant owed to 'society'". 374 F.Supp. at 856–857. Of most significance for our purposes is the court's conclusion that the qualifications placed on punitive damage awards by the Pennsylvania courts necessarily limited the relevance of the plaintiff's proffered evidence.

The problem we faced in the instant case was quite similar. Throughout the course of the trial, plaintiff's counsel was of the view that all evidence, whether its place in time was before or after May 26, 1971, was relevant to showing the nature of ACMI's conduct as the factual predicate for a punitive damage award.[14] Plaintiff, in effect, sought to have the jury pass judgment on behalf of society on this company's policies and practices regardless of any relation to the accident which caused Dr. Thomas' injury. The fact remains, however, that the result of that assessment, in the form of punitive damages, would ultimately have been awarded to this particular plaintiff. For that reason, at trial, we limited plaintiff's proof, like the court in *Hoffman*, to evidence of "the defendant's conduct vis-a-vis the plaintiff" or in other words, to facts and circumstances up until the time of plaintiff's injury.

---

**13.** The dearth of reported instances where such claims have been made or sustained in other jurisdictions as well attests to the dilemma. Indeed, at least one court has questioned the propriety of allowing punitive damages in products liability cases. See, *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2nd Cir. 1967). Although the specific question appears not to have been raised or ruled upon directly by the Pennsylvania courts or by any court interpreting Pennsylvania law, we take it as established, by virtue of the court's tacit approval of the punitive damage claim on appeal in *Hoffman*, 485 F.2d 132 (3d Cir. 1973), that there is no *per se* preclusion against awarding punitive dam-

ages where, as here, strict liability under § 402A of the Restatement of Torts (Second) was introduced as plaintiff's theory of liability. This court knows of no sound reason why the conclusion should be otherwise. We note, however, that ACMI does not contend that punitive damages may not, as a matter of law, be awarded in products liability actions, but only that the facts of this case do not justify such an award.

**14.** As will be seen below, the evidence of ACMI's conduct *after* plaintiff's accident was really the critical foundation of the claim for punitive damages.

Two possible justifications exist for plaintiff's theory of proof, both of which we find to be in error.

■ The first is the argument urged on the court in *Hoffman*, that the evidence relevant to the issue of punitive damages should encompass the wrongful conduct of the defendant with respect to all users of its products in order to foster the punitive and deterrent functions that such damages are meant to accomplish. But, as we have seen, these policies are not unqualified. It is quite clear, in fact, under Pennsylvania law, that they are limited by the requirements that the injured plaintiff prove that the defendant's conduct caused actual damage and further that there be a reasonable relationship between the actual and punitive damages awarded. *Hoffman*, supra, 374 F.Supp. at 856; *Suflas v. Cleveland Wrecking Co.*, supra. The allowance of punitive damages does not convert a civil action into a quasi-criminal proceeding. In our view, the law has attempted to balance competing interests, and we agree with the court in *Hoffman*, particularly in products liability cases where there is a genuine potential for multiple recoveries, that these qualifications must be preserved.[15]

■ In the alternative, possible support for the admission of evidence of ACMI's conduct after plaintiff's injury is found in the notion that it would show inferentially the defendant's prior state of mind or intent. Plaintiff has called our attention to the recent case of *Gillham v. Admiral Corporation*, 523 F.2d 102 (6th Cir. 1975) in which this exact issue was raised, but not decided. It is true that there is some authority for a similar proposition in Pennsylvania,[16] but none that we know of with regard to a claim for punitive damages. We do not believe that such a rule can be applicable here, for much the same reason as formerly discussed. To allow evidence of defendant's subsequent conduct presents the distinct opportunity for the imposition of punitive damages for conduct that may have no connection whatsoever with the injured plaintiff, contrary to what we take to be the settled law.

■ We are of the opinion now, in accord with our conclusion at the time, that evidence of ACMI's conduct after plaintiff's injury is not relevant to the issue of punitive damages. It was properly excluded at trial and may not be considered now in testing the validity of the punitive award.

We have extended this discussion to this length because it is apparent that plaintiff, in his argument in opposition to the present motions, persists in the erroneous position which he took at trial, that the jury be permitted to consider the whole range of evidence regarding ACMI's conduct. While most of the facts concerning defendant's later conduct were before the jury for very limited purposes relating to liability issues, such matters were in no way relevant to the question of punitive damages. The Court specifically instructed plaintiff's counsel on the permissible use of this evidence in his argument, and we charged the jury to the same effect. Because it could properly have considered only the evidence of defendant's conduct prior to May 26, 1971, when plaintiff's accident occurred,[17] and be-

---

**15.** One commentator has observed the following:

"The basis for an award of punitive damages—as punishment for and deterrent from conduct that is intentional, or reckless, willful or wanton—is not peculiar to products liability cases. However, in most types of actions in which punitive damages are recoverable, there usually is one plaintiff. In a products liability context, however the spectre of punitive damages is particularly disturbing to the manufacturer who distributes his products to thousands, and sometimes millions of users."

3 Frumer and Friedman, *Products Liability* § 33.01[7] at 271 et seq. This is exactly the problem that greatly concerned Judge Friendly in *Roginsky v. Richardson-Merrell, Inc.*, supra. But, compare 6 Geo.L.Rev. 613 (1972).

**16.** See, e. g. *Jamestown Iron & Metal Co. v. Knofsky*, 302 Pa. 483, 154 A. 15 (1931); *Baumeister v. Baugh & Sons Co.*, 142 Pa.Super. 346, 16 A.2d 424 (1940), and 32 C.J.S. Evidence § 580.

**17.** Even if the jury disregarded the Court's instructions and evaluated all of the evidence, a new trial is not appropriate since at any re-tri-

cause we find that that evidence provided no reasonable basis for the jury to have concluded that ACMI acted with a bad motive or with reckless indifference to the interests of users of its products, we must enter judgment n. o. v. for the defendant on the issue of punitive damages. We turn to the evidence adduced at trial.

According to the testimony ACMI first marketed the "photographic" eyepiece in 1963. Its original composition was of aluminum, and, as already noted, it was intended to be used only with various special viewing attachments. In 1969, however, the company admittedly became aware that surgeons might be using this uninsulated device for direct viewing, when it began to receive instruments back for normal repairs and servicing with photographic eyepieces attached. Apparently in response, ACMI introduced a new photographic eyepiece that same year which was made of non-conductive nylon material. The evidence is quite clear, however, that no warnings or other instructions were sent out at that time nor had any previously been issued to advise physicians of the appropriate limited use to be made of the photographic eyepiece. It was this later model eyepiece that Dr. Thomas was using when he was injured, and yet, it is not disputed, that even it was not fully insulated. The metallic end of the telescope shaft remained exposed, though slightly recessed in its center when the eyepiece was affixed to the resectoscope. The evidence further disclosed that no instance of a similar occurrence had ever been reported to ACMI prior to plaintiff's accident. In fact, there was little, if any, testimony offered regarding ACMI's knowledge of the specific hazard which this newer style eyepiece presented except from events that transpired after Dr. Thomas' accident. Nonetheless, plaintiff based his argument on the fact that ACMI, again admittedly, was aware of reports of other types of burn injuries from use of its instruments, although none had involved a burn to a surgeon's eye and none which had occurred

without some other malfunction of the equipment or a break in the electrical circuit. In addition, there was testimony concerning a somewhat obscure reference in the medical literature as to the possibilities of electrical shocks during urological surgery as early as 1959, which, along with the other alleged "knowledge" of the risks inherent in the use of the photographic eyepiece, it is argued, ACMI totally ignored by continuing to sell its dangerous product. It is this conduct which plaintiff contends was "outrageous" in its "reckless indifference to the interest of others."

■ "Recklessness", however, is something more than plaintiff proved in this case. By definition, it requires a finding of a readily perceptible danger and a conscious choice on the part of the alleged wrongdoer to act despite clear knowledge of a highly probable risk of serious harm. § 500, Restatement of Torts, Comment b of that section of the Restatement contains an instructive example:

> Conduct cannot be in reckless disregard of the safety of others unless the act or omission is itself intended, notwithstanding that the actor knows of facts which would lead any reasonable man to realize the extreme risk to which it subjects the safety of others. It is reckless for a driver of an automobile intentionally to cross a through highway in defiance of a stop sign if a stream of vehicles is seen to be closely approaching in both directions, but if his failure to stop is due to the fact that he has permitted his attention to be diverted so that he does not know that he is approaching the crossing, he may be merely negligent and not reckless. So, too, if his failure to stop is due to the fact that his brakes fail to act, he may be negligent if the bad condition of the brakes could have been discovered by such an inspection as it is his duty to make, but his conduct is not reckless."

■ Here, ACMI did little to fulfill its responsibility as a manufacturer for the safety of its products. It failed to take the

al, the only evidence which the jury would have to consider is that prior to May 26, 1971, which

we find to be insufficient as a matter of law. The result would therefore be the same.

quite reasonable steps which it might have under the circumstances to have avoided the clearly foreseeable risk of harm. But the fact that the danger should have been foreseen does not mean, contrary to plaintiff's assertion, that the risk was fully realized, or at least, realized to the extent necessary to show that degree of knowledge which when consciously disregarded deserves the opprobation of "recklessness." In short, the most that can be said from the evidence is that, measured by an objective standard of care, this defendant should have done more. We simply cannot say that the evidence was sufficient to demonstrate that subjective kind of awareness that is the distinguishing element of reckless conduct. Compared to the overwhelming proof of "outrageous conduct" that has characterized the few other cases where courts have held that punitive damages were appropriate, plaintiff's evidence in this case was plainly lacking.[18]

This is not to cast disparagement on the sufficiency of the evidence as to the defendant's liability for compensatory damages. Nonetheless, lacking the essential evidence to prove that ACMI's conduct toward this plaintiff was reckless, the issue of punitive damages should not have been submitted to the jury. It is quite clear, we think, from the evidence, that the jury could well have found negligence or even gross negligence on the part of this defendant. But negligent conduct, no matter how gross or wanton, cannot be equated with the conduct required for punitive damages. We hold, therefore, that plaintiff's evidence in this case was insufficient as a matter of law to demonstrate that type of "outrageous conduct" on which an award of punitive damages must depend.[19]

### III. MOTION FOR A NEW TRIAL

The remaining substantial contentions which ACMI has raised are all in support of its alternative motion for a new trial. For the reasons to be stated we find none of them of merit.

#### A. *Punitive Damages.*

We note, initially, that we do not depart from our strong belief that judgment must be entered in the defendant's favor on the issue of punitive damages. Nonetheless, it is the Court's obligation under Rule 50(c)(1) of the Federal Rules of Civil Procedure to rule conditionally on matters allegedly warranting a new trial, which we do in summary fashion.

1. Defendant first complains that the Court unfairly allowed plaintiff to amend his pleadings on the eve of trial to state his claim for punitive damages. As we found at that time, however, the facts on which the previously unasserted claim was based were all known or available to all parties. (See our Memorandum and Order of October 24, 1974). There was, therefore, no prejudice in allowing the amendment. *Hoffman v. Sterling Drug, Inc.,* 485 F.2d 132 (3d Cir. 1973). Nor did the Court thereafter abuse its discretion in denying defendant's motion for a continuance.

2. Defendant next asserts that the evidence of ACMI's net worth was improperly admitted. It argues that such information was totally irrelevant to the puni-

---

18. The cases which have dealt with punitive damages in a products liability context are collected at 29 A.L.R.3d 1021.

19. This decision is that much more difficult in light of our awareness of the defendant's conduct after the date of plaintiff's accident. In particular, the evidence disclosed, and ACMI does not dispute, that even after the incident it did nothing to warn physicians concerning use of the uninsulated eyepiece until January 1973 when it issued a recall notice. There is little doubt that the company was well aware of the specific hazard many months before, however, since, it designed a small plastic insert to be used to cover the metallic ocular end of the resectoscope shaft in October, 1971. No explanation was offered for such inaction. Moreover, even this modification did not fully insulate the eyepiece. Of greater concern is the fact that ACMI did not see fit to supply this new insert to users of its products or to advise hospitals and surgeons of its availability. While this additional evidence would seem to be enough to have rightly taken the issue to the jury, this does not deter us from our prior conclusion that it was properly excluded.

tive damages allowable to this plaintiff in line with the conclusion reached by the court in *Hoffman v. Sterling Drug, Inc.,* supra 374 F.Supp. at 856–857. Pennsylvania courts, however, have ruled to the contrary (although not in a products liability case) that the net worth of a defendant is admissible as an aid to the jury in determining the appropriate amount of damages which will serve the punitive purpose. *Aland v. Pyle,* 263 Pa. 254, 106 A. 34 (1919); see also, *Thomas v. E. J. Korvette, Inc.,* 329 F.Supp. 1163, 1169 (E.D.Pa.1971). Whatever conflict may exist between this and other principles applied with regard to punitive damage awards, *Thomas,* supra 329 F.Supp. at 1170, we are bound to accept the clearly stated law of Pennsylvania. Properly limited instructions, as were given in this case, we think eliminate the potential for prejudice.

Moreover, there was no prejudice here although defendant charges the verdict was excessive. Assuming that it could properly have found defendant's conduct warranted them, the punitive damages assessed give no indication that the jury reacted out of passion or other improper motivation, despite its awareness of ACMI's substantial net worth. Its award was, in fact, quite reasonable.[20]

3. The further assertion by the defendant that the court's charge was inadequate in failing to define and distinguish "outrageous conduct" from other types of culpable conduct is unfounded. In light of the fact that the courts have not satisfactorily resolved the semantic differences (see, e. g., *McSparran v. Pennsylvania Railroad Co.,* supra), it was not error to refuse to charge the jury in a manner which could only have

led to confusion. The instruction which defendant proposed would have been no more helpful. Cf. *James v. Continental Insurance Co.,* 424 F.2d 1064, 1065, (3d Cir. 1970). .

4. Finally, defendant urges our consideration of numerous evidentiary rulings under its heading "Other improper evidence" which, it is claimed, were prejudicial. Eleven separate matters are discussed. We have reviewed each one carefully. In most instances the point that defendant ignores is that the item of evidence complained of was relevant only for specific purposes and its admission was properly so limited. In addition, where appropriate, the Court instructed the jury with respect to the limitations on the use of the evidence received.[21] We find no error in any of the matters specified which requires the granting of a new trial in the interest of substantial justice.[22] Fed.R.Civ. P. 61.

B. *Compensatory Damages.*

ACMI also seeks a new trial with regard to the compensatory damage award. In the main, it is charged that the verdict was wholly speculative and without any support in the evidence insofar as it included an amount for loss of future earnings. Several points are raised: (1) that there was no proof of plaintiff's individual loss of income since the evidence which was presented related solely to the partnership of which Dr. Thomas was a member; (2) that Dr. Verzilli, an expert economist who made projections of plaintiff's future losses, was not properly qualified as an actuary; (3) that Dr. Verzilli was also improperly permitted to testify as to a "growth factor" in plain-

---

**20.** Any inconsistency between this and the former discussion on the same subject on the motion for judgment n. o. v. is reflective of the difficulty in making such conditional rulings. Cf. 5A Moore's Federal Practice § 50.13[1].

**21.** That portion of our charge is found at N.T. 11–27–74 at pp. 29–31.

**22.** We comment additionally on two specific issues defendant raises only to make reference to the Federal Rules of Evidence which, al-

though not in effect at the time of this trial, are nonetheless persuasive authority: (1) the allegation that it was error to allow Dr. Bogash to testify as to the contents of a medical treatise because it was hearsay is refuted by Rule 803(18); (2) defendant's argument that plaintiff's expert witnesses improperly invaded the province of the jury by being permitted to testify on the "ultimate issue" as to the safety of the photographic eyepiece is completely dispelled by Rule 704.

tiff's loss of earnings; and (4) that the jury was given insufficient guidance on how to compute the present worth of any future losses that it found.

Dr. Thomas was at the time of trial and had been since 1972 associated with two other urology specialists in a partnership in South Carolina. In 1973, the three surgeons entered into a partnership agreement to establish their relationship. As it was originally planned, as the senior member of the firm gradually decreased his active practice, Dr. Thomas was to become a full partner. Plaintiff's injury, however, brought about a different result and altered that arrangement.

According to the testimony, the source of plaintiff's claimed loss of earnings was his inability to perform transurethral resections, called TUR's for short, which are one of the mainstays of a urologist's practice. As a result, two specific financial losses would occur. First, there would be a reduction in the income to plaintiff's partnership from that number of operations that he might have been expected to do and consequently a reduction in Dr. Thomas' own share of the income. Secondly, because of an amendment to the partnership agreement brought about by recognition of his impairment, plaintiff was to share in only approximately 32 percent of the remaining partnership income instead of enjoying a series of increases to a full 50 percent share by the year 1980. From this and other information, Dr. Verzilli gave his opinion as to plaintiff's earning capacity to age 65. In addition, he projected what plaintiff's future income might reasonably be subject to the economic growth he found could be expected in his earnings in the future.

Defendant first charges that the Court erred in allowing partnership income figures to be used in establishing Dr. Thomas' loss of earnings. It is asserted that such evidence is not admissible as a measure of one member's individual earning capacity. See, e. g., *Sherin v. Dushac,* 404 Pa. 496, 172 A.2d 577 (1961); *James v. Ferguson,* 401 Pa. 92, 162 A.2d 690 (1960); *Dempsey v. City of Scranton,* 264 Pa. 495, 107 A. 877 (1919). But while we would certainly agree with this rule as a general proposition of law, the point is simply that it has no application in this case.

■ The flaw in defendant's argument in this regard is its misunderstanding of the limited use that was made of this evidence. In fact, plaintiff's expert used the partnership figures only to demonstrate the productivity of the firm in terms of the loss to Dr. Thomas in his reduced share of the partnership earnings, and in conjunction with other data, for his opinion on the potential growth of plaintiff's future earning capacity. Unlike the cases which ACMI has cited that have precluded evidence of this sort, the evidence here was not presented as a direct measure of earning capacity, but rather as a basis from which that earning capacity could be derived. It was offered and admitted as a necessary part of the factual background that would allow a reasonable assessment of the loss of earnings to this particular plaintiff.[23] Moreover, to have excluded the evidence of partnership profits would have left the matter open for an even' greater degree of speculation since the jury then would have had only general statistical information unrelated to the facts and circumstances of plaintiff's financial future on which to rely in fixing the amount of damages. Any loss of future earnings which Dr. Thomas would sustain was best shown in terms of the dollar amount represented by his percentage share of the firm's income as controlled by the partnership agreement. This, in effect, offered an estimation of the value of plaintiff's services to the partnership which is the proper measure of damages to be applied. See, *Sherin v. Dushac, supra.* The plaintiff produced the evidence available and relevant to the question of his future losses. We believe that there was a sufficient basis for the jury to intelligently and accurately have assessed the plaintiff's damages resulting from the impairment of

---

**23.** We note also that defendant's own expert found it appropriate and necessary to consider the same information in formulating his own projections of plaintiff's earning capacity.

his earning capacity with the requisite reasonable certainty. Cf. *Russell v. City of Wildwood*, 428 F.2d 1176 (3d Cir. 1970); *Frankel v. Todd*, 393 F.2d 435 (3d Cir. 1968).

■ We also find the argument that plaintiff's expert Dr. Verzilli, was not qualified to give actuarial testimony because he was not actually an actuary to be wholly without merit. The voir dire examination revealed not only that the witness was eminently qualified as an economist by profession, but also that he was sufficiently skilled in actuarial theory and technique by reason of his experience. See, *Abbott v. Steel City Piping Co.*, 437 Pa. 412, 263 A.2d 881 (1970); *Reardon v. Meehan*, 424 Pa. 460, 227 A.2d 667 (1967). Thus, having met the minimum requirements for qualification under Pennsylvania law, *Kuisis v. Baldwin-Lima-Hamilton Corp.*, supra; *Griffith v. Clearfield Truck Rentals, Inc.*, 427 Pa. 30, 233 A.2d 896 (1967); *Moodie v. Westinghouse Electric Corp.*, 367 Pa. 493, 80 A.2d 734 (1951), the admission of his testimony was a matter for the Court's discretion. *Idzojtic v. Pennsylvania Railroad Company*, 456 F.2d 1228 (3d Cir. 1972); *Bowers v. Garfield*, 382 F.Supp. 503 (E.D.Pa.1974).

■ Aside from his qualifications, defendant challenges the substance of Dr. Verzilli's testimony with respect to his opinion, based on the past income history of plaintiff's partnership, statistical data on the earnings of medical partnerships, and general economic trends, that there would be, at a minimum, a three percent annual growth in Dr. Thomas earnings until his retirement. Defendant contends that this whole subject is too speculative and should not have been permitted. Yet, neither *Hoffman v. Sterling Drug, Inc.*, 485 F.2d

132 (3d Cir. 1973) which defendant has cited in support of its argument, nor the case on which *Hoffman* specifically relies, *Magill v. Westinghouse Electric Corp.*, 464 F.2d 294 (3d Cir. 1972), held that testimony as to "economic growth" could not be considered. To the contrary, both cases imply clearly that future increases in earnings is a proper matter for the jury so long as there is sufficient competent evidence of "probable future salary trends or economic trends"[24] *Hoffman*, supra, 485 F.2d at 144, as quoted in *Huddell v. Levin*, 395 F.Supp. 64 (D.N.J. 1975).

In the instant case, Dr. Verzilli's testimony gave the jury substantial evidentiary support for an award of damages based on future growth of earnings.[25] It is clear that, at least, the evidence thereof was properly admitted. What weight, if any, was to be given to the testimony was, of course exclusively within the province of the jury.

■ Lastly, with regard to damages, ACMI contends that the jury was without "appropriate mathematical guidance" as to the method of computing the present worth of plaintiff's future losses. See, *Haddigan v. Harkins*, 441 F.2d 844 (3d Cir. 1970); *Russell v. City of Wildwood*, supra. We disagree. Both of the economic experts who testified amply described and illustrated the concept of present worth and applied it to their various calculations. While it is true that the commonly utilized actuarial tables were not introduced in this case, we do not read either of the decisions cited above as mandating the use of such tables as the only evidentiary guidance that will permit the jury "to act rationally and not upon mere conjecture or guess." *Haddigan*

**24.** We are aware of the more limited reading given to these two cases by the court on remand in *Hoffman*, 374 F.Supp. 850 (M.D.Pa. 1974). In our view, however, the court's interpretation there was too narrow. We subscribe instead to the analysis of the issue by Judge Cohen in *Huddell v. Levin*, supra.

**25.** It is interesting to note in this case that there was no clash of opinion between plaintiff's economist and defendant's expert, Mr. Bunin, on the economic conclusion that growth

could reasonably be expected in the future. Their difference of opinion focused on whether or not that trend could be applied to the plaintiff. We reject defendant's argument that the general economic theories espoused were not sufficiently related to this particular plaintiff's financial future. In a case involving a non-wage earner, such as here, "future growth of earnings can only be projected within the framework of the economy as a whole." *Huddell v. Levin*, supra, 395 F.Supp. at 84.

supra, 441 F.2d at 853. Moreover, the court specifically charged the jury here on the manner of computation and the legal rate of interest to be applied.[26] To the extent that it can ever be made understandable, we believe that the jury here had sufficient guidance on the subject of present worth.

Thus we conclude that defendant's motion for a new trial as to both the punitive and compensatory damage awards must be denied.

## IV. MOTION FOR A NEW TRIAL: DISMISSAL OF OTHER DEFENDANTS

Finally, we reach the allegation of error that the Court improperly directed verdicts in favor of the codefendant Medesco, Inc. and the third-party defendant, Episcopal Hospital following the opening address to the jury by ACMI's counsel. (See, Footnote 1, above)..

It is important to note at the outset, that at trial, these rulings came after plaintiff had sought and was granted leave to withdraw his claims against all other parties besides ACMI. With these actions thus dismissed, there remained only the cross-claim of ACMI against Medesco and its third-party action against the hospital, in both of which ACMI was deemed technically the plaintiff with the ordinary burden of proof. During the course of his opening remarks, counsel for ACMI made no mention whatsoever of these secondary claims preferring instead merely to ask the jury to keep an open mind throughout the trial. Upon appropriate motions made immediately thereafter, directed verdicts were entered, and the actions against both additional parties were dismissed.

The authority of the Court to direct verdicts in this manner is well-established. "Ever since *Oscanyan v. Arms Co.*, 103 U.S. 261, 26 L.Ed. 539, it has been settled that a federal court may direct a verdict for a defendant upon the opening statement of plaintiff's counsel if it clearly appears

therefrom that the plaintiff has no cause of action." *Morgan v. Koch*, 419 F.2d 993, 999 (7th Cir. 1969). As the court stated in *Best v. District of Columbia*, 291 U.S. 411, 415, 54 S.Ct. 487, 489, 78 L.Ed. 882 (1934):

"There is no question as to the power of the trial court to direct a verdict for the defendant upon the opening statement of plaintiff's counsel where that statement establishes that the plaintiff has no right to recover. The power of the court to act upon facts conceded by counsel is as plain as its power to act upon evidence produced. *Oscanyan v. Arms Co.*, 103 U.S. 261, 263, 26 L.Ed. 539. The exercise of this power in a proper case is not only not objectionable, but is convenient in saving time and expense by shortening trials."

While we agree with defendant that there is a difference between an opening address which omits statements of the contentions against a particular party and one which established that no cause of action exists, in this case, there was not a scintilla of evidence to indicate any basis for liability on the part of either Medesco or the hospital. Moreover, any prejudice to ACMI in its claim against Episcopal was *de minimis* since the hospital was plaintiff's employer and any contribution which ACMI could have obtained even if it had been successful in proving its case was limited to the amount of the workmen's compensation lien which here was less than $50.00 in total.[27] As to the claim against Medesco, there also was no prejudice. The record before us reveals that ACMI did not file its cross-claim against this co-defendant until October 10, 1974, just four days prior to the commencement of trial yet long after the time when such a claim might reasonably have been asserted. In addition, counsel for ACMI, in arguing on the directed verdict motion, candidly admitted that "as to my cross-claim against Medesco, Your Honor, at least as of now we haven't had any evidence." (N.T. 11–6–74 at 7). It was on this basis at the time that we concluded

---

**26.** See, N.T. 11–27–74 at 21–23.

**27.** *Globe Indemnity Company v. Agway, Inc.*, 456 F.2d 472 (3d Cir. 1972); *Maio v. Fahs*, 339 Pa. 180, 14 A.2d 105 (1940).

that the cross-claim should be dismissed. Nothing in the transcript of the testimony and evidence adduced over the course of 17 days of trial in this case affords any reason why we should now find otherwise. Any error that might have occurred in this regard was clearly insufficient to warrant the granting of a new trial.

## V. CONCLUSION

We have carefully reviewed all of the remaining arguments put forth in the defendant's copious briefs which, although not herein discussed, we find to be lacking in merit.

In sum, therefore, for the reasons that have been stated, the Court will grant ACMI's Motion for judgment n. o. v. as to the award of punitive damages alone; in all other respects, the Motion for judgment notwithstanding the verdict or for a new trial will be denied.